# JUNE TERM 1885.*

| 58 | 1 |
|---|---|
| 62 | 260 |
| 58 | 1 |
| 82 | 92 |

58   1
108   536

CYNTHIA W. CRAWFORD v. HERMAN HOEFT, FRANCIS CRAW-
FORD, JAMES D. TURNBULL, ADMINISTRATOR FOR FRANCIS
CRAWFORD, ANNA M. CRAWFORD, EDWIN HADLEY,
CHAS. R. MILLER AND JOSIAH C. ROWLEY.

*Forgery—Burden of proof of good faith—Laches—Release.*

1. In determining the existence of a forgery it is proper to consider the relationship of the parties who profit and suffer by it, and the age and mental condition of the latter.

2. Where a mother whose mind is weakened by age has dealings in reference to her property with a son who has control of it, and relies upon his integrity not to mislead her, the dealings must be characterized by perfect good faith, and the burden of establishing its fairness is on those whose claims are based on these dealings.

3. A son obtained apparent control of his mother's property by means of a forged deed, but she prevailed on him to convey it back to her, which he did under certain conditions by deed in escrow; but at the same time, without her knowledge, he conveyed away and mort-gaged portions of the property. *Held,* that she was justified in repudiating the settlement, not only because of the fraud upon her, but because the settlement gave her nothing of value.

4. The long form warranty deed on paper folding like legal cap and with the description on one leaf and the attestation clause and acknowl-edgment on the other, is criticized as affording unusual facilities for fraud.

5. Rights are not lost by laches as against persons claiming under a forged deed.

6. Innocent purchasers under a forged deed are in no better position as to title than if they had purchased with notice.

7. Land exchanged in consideration of the conveyance of other land by a forged deed may be recovered back, even from subsequent pur-chasers.

---

* Continued from Vol. 57.

8. A release by the party defrauded by a forgery, of rights set up under a forged deed by subsequent purchasers, may be effectual and valid.

9. The Supreme Court has power to issue any writ necessary to the enforcement of its decrees; but it may also leave it to the court below to issue such writ, where the lower court has power to do so, if the record has been remanded to that court.

10. A person in possession under a forged deed can claim no rights; and even if he has made improvements, ejectment need not be resorted to for the purpose of recovering possession from him after a decree requiring him to give it up; a writ of restitution is enough.

Appeal from Presque Isle (Emerick, J.) October 23, 1884.—April 9, 1885. Re-heard, June 2–3.—September 29.

BILL to cancel deed. Complainant appeals. Reversed.

*George W. Bates* and *Alfred Russell* for complainant. As to the conclusiveness of a notary's certificate upon the fact of signing: *Hourtienne v. Schnoor* 33 Mich. 274; *Johnson v. Van Velsor* 43 Mich. 219; see also *Cameron v. Culkins* 44 Mich. 533; *Camp v. Carpenter* 52 Mich. 375; *Matter of Wool* 36 Mich. 299; *Blair v. Compton* 33 Mich. 453; for cases in which deeds have been set aside for fraud on the grantor and other reasons see *Case v. Case* 26 Mich. 492; *Wartemberg v. Spiegel* 3 Mich. 402; *Seeley v. Price* 14 Mich. 547; *Thorn v. Thorn* 51 Mich. 167; *Wright v. Wright* 37 Mich. 57; *Savery v. King* 5 H. L. Cas. 626; *Allore v. Jewell* 94 U. S. 506; *Kempson v. Ashbee* L. R. 10 Ch. App. 15: 11 Eng. 401; there can be no bona fide purchase after a forgery: *Austin v. Dean* 40 Mich. 388; Kerr on Fraud, 314; and an attorney's knowledge is that of his client: *Larzelere v. Starkweather* 38 Mich. 107; *May v. Le Claire* 11 Wall. 217; *Smith v. Ayer* 101 U. S. 325; the want of notice necessary to a bona fide purchase must exist at the time of payment as well as of purchase: *Warner v. Whittaker* 6 Mich. 135; *Dixon v. Hill* 5 Mich. 404; *Blanchard v. Tyler* 12 Mich. 339; *Stone v. Welling* 14 Mich. 514; *Kohl v. Lynn* 34 Mich. 360; *Thomas v. Stone* Wal. Ch. 117; *Palmer v. Williams* 24 Mich. 328; *Battershall v. Stephens* 34 Mich. 75; *Matson v. Melchor* 42 Mich. 481; *Smith v. Williams* 44 Mich. 241; *Boxheimer v. Gunn* 24 Mich. 372; *Chadwick v. Broadwell* 27 Mich. 6; *Haescig v. Brown* 34 Mich. 503; an agent's knowledge is also that of his principal: *Russell v. Sweezey* 22 Mich. 235; *Sanford v. Nyman* 23 Mich. 326; *Emerson v. Atwater* 7 Mich. 12; 1 Story's Eq. Jur. § 408; those who

are not bona fide purchasers take subject to existing claims ; *Smithers v. Heather* 25 Mich. 447 ; delay in seeking relief against fraud affects the complainant only after he has the means of knowledge thereof: *Browne v. McKlintock* L. R. 6 H. L. 456 : 8 Eng. 54 ; *Lindsay Petroleum Co. v. Hurd* L. R. 5 P. C. 221 : 8 Eng. 180 ; see *Hatch v. Hatch* 9 Ves. 292 ; *Wollaston v. Tribe* L. R. 9 Eq. 44 ; for cases upon for-gery of signature to deed see *In re Cooper* L. R. 20 Ch. Div. 627 ; 3 Pomeroy's Eq. Jur. 416.

*Turnbull & Dafoe* (for defendants Hoeft and Turnbull) and *C. R. Miller* and *Millard, Weaver & Weaver* (for defendants Rowley and Miller) for appellees. A sealed instru-ment is conclusively presumed to be on good consideration, unless it is impeached for fraud : Best on Evidence §§ 220, 429 ; a sealed release cannot be qualified by parol : 2 Pars. Cont. 713, 715 ; an executed release will be enforced, though voluntary, as it requires no further act to give it effect : Story's Eq. Jur. § 793 *a* ; one who has long neglected to pro-tect others from dealing with a person who has obtained interests by fraud, is estopped from claiming anything against such others. Id. §§ 1533–51.

Cooley, C. J. This case came before us with a voluminous record, containing a great deal of conflicting evidence, and has given us no little trouble. The purpose of the bill was to obtain an adjudication that a deed purporting to be made by complainant to her son was a forgery by the son, and that subsequent conveyances and mortgages by the son were therefore void.

The argument of the case left me somewhat impressed with complainant's view of the facts, but on a careful reading of the testimony afterwards I found this impression substan-tially effaced. And the more I have reflected upon the case since, the more convinced I have become that the deed in question was made by complainant, who weakly suffered herself to be misled and defrauded by her worthless son. This conclusion would dispose of the case and entitle the defendants to protection.

I therefore think the decree should be affirmed. But in affirming it I should deem it proper to provide that if, pen-ding this suit, any of the defendants holding incumbrances

from which the complainant would be entitled to redeem have taken proceedings in foreclosure, such proceedings should be held subject to redemption still, and on settlement of the decree time should be fixed for that purpose, if not agreed upon.

CHAMPLIN and SHERWOOD, JJ., concurred.

CAMPBELL, J. Although the case is one which is not at all satisfactory in many respects, my opinion is that the deed complained of was not a genuine instrument.

Motion for rehearing.    Granted.

*Bates* and *Russell* for the motion. Where proof of forgery is in harmony with the general purpose of a bill to cancel a deed for fraud, relief is proper: Story's Eq. Pl. (Redf. ed.) § 40; *Hobson v. M'Arthur* 16 Pet. 195; *Scudder v. Young* 25 Me. 153; and a court that has once acquired jurisdiction of the parties will retain it for any purpose within the scope of the equities to be enforced: *Mason v. Hartf., Prov. & F. R. R. R. Co.* 19 Fed. Rep. 55; *Ober v. Gallagher* 93 U. S. 199; *Ward v. Todd* 103 U. S. 327; and will make the relief sufficient to dispose of the case: *Miller v. Stepper* 32 Mich. 203; *Carroll v. Rice* Walk. Ch. 374; *Brown v. Gardner* Har. Ch. 291; *Whipple v. Farrar* 3 Mich. 436; *Hawkins v. Clermont* 15 Mich. 511; *Folkerts v. Power* 42 Mich. 283; leave should at least be granted to amend the bill if the amended case is sustained by the proofs: *Church v. Holcomb* 45 Mich. 39; *Smith v. Sherman* 52 Mich. 637; *Parrill v. McKinley* 9 Grat. 1; *Hewett v. Adams* 50 Me. 371; *Whelan v. Sullivan* 102 Mass. 204; *Neale v. Neale* 9 Wal. 1.

*Turnbull* against.

The motion was granted. The case was again heard June 2–3, 1885, and was decided September 29.

*Bates* and *Russell* for complainants.

*Turnbull, Shields & Dafoe, Chas. R. Miller* and *Millard, Weaver & Weaver* for defendants.

CHAMPLIN, J. This is a suit to cancel a conveyance of lands in the county of Presque Isle, purporting to have been made by the complainant to her son Leonard C. Crawford on the 10th day of August, 1878, and also to set aside a deed made by Crawford to defendant Hoeft, and also a mortgage executed by Crawford to Edwin Hadley and by him assigned to the defendants Miller and Rowley, as encumbrances upon the property. Leonard C. Crawford died in 1881, leaving no children. Defendant Francis Crawford is the father of Leonard; defendant Turnbull, the administrator of his estate; and Anna M. Crawford is his widow.

The bill of complaint was filed on the 15th day of August, 1882, and alleges that on and prior to August 10th, 1878, the complainant Cynthia W. Crawford, owned the property in suit, consisting of several thousand acres of land in Presque Isle county, upon which was a village called Crawford's Quarry, a saw-mill, store and a valuable stone quarry; that in September, 1873, for the purpose of starting business at Crawford's Quarry, she leased a part of these lands to her son Leonard C. Crawford, he agreeing to pay her five hundred dollars a year for her support, and pay the taxes on her property in that county; that he did business there under this lease until some time prior to August 10th, 1878, when, the lease having expired, he requested an indefinite continuation of such lease, and proposed that she deed him, during his life, the quarry lands, covering the lake front and mill property, to be used by him during his life, and on his death to revert to her, as a means of providing for him against any reverses that might happen to her; that she consented, but expressly reserved section twelve, the town plat, and the old homestead, and with the understanding that this deed was not to be recorded but simply should be held by him as the evience of his life-lease in said land, with no right of sale, and on the further understanding that Leonard should comply with all the terms of the old lease, and especially as to the payment of the taxes and of five hundred dollars annually to herself, said deed being intended to simply extend said lease during the life of said Leonard and subject to the same con-

ditions; that she signed what purported to be a deed of the quarry lands, with the reservations and agreement mentioned, but never acknowledged it, as it was not intended to be recorded; that she resided at the "Quarry" during the summers, and at Detroit during the winters, and never knew or heard that her son Leonard claimed to have a deed of said lands other than the one intended as a life-lease until the winter of 1880, when she learned that her son Leonard had placed a deed upon record of all her lands; that she never signed or acknowledged such deed, but that it was signed and forged by her said son, without her knowledge or consent, and that, to conceal its existence as long as possible, it was kept from the record for nearly six months, and when it was recorded it was so indexed as to still further conceal its existence; that she charged her son Leonard with having a false and fraudulent deed from her on record of all her lands, and repeatedly tried to get him to restore said premises to her, but he, while he always promised to do so, continually delayed doing anything for her in that respect for the purpose of gaining time to sell or encumber the whole of said property, and put it, as he supposed, beyond her reach, and for this purpose he did, without her knowledge or consent, on the 15th of October, 1880, execute a deed to Herman Hoeft for four thousand dollars of an undivided one-half interest in section twenty-four, where the town site, the mill and dock property are located, and on the same day he executed to Edwin Hadley a mortgage for eight thousand dollars, covering the balance of her said lands, which mortgage was on October 27th, 1880, assigned to defendants Miller and Rowley for seven thousand five hundred dollars; that both the Hoeft deed and Hadley mortgage were taken with a knowledge of this claim; that in October, 1880, she went with counsel to the " Quarry " to compel her son to restore these lands, and after much effort, finally induced him to do so on the 16th of October, 1880, by deed, which was left with William A. Moore, of Detroit, in escrow, to be delivered to her on the death of her son, and on her paying one thousand dollars to his widow, but if she died first, the same was to be returned to her son and canceled;

that this deed was taken without knowledge of the Hoeft deed and Hadley mortgage, and was supposed to embrace all the lands, with the title in the same condition as on that 10th day of August, 1878, but when she learned that it did not so convey all these lands, and was to be received subject to these conditions and also said conveyances, she repudiated it as a fraud on her rights in the premises, and claimed all her lands free and clear of any encumbrances placed thereon by him. The prayer is for a decree setting aside this deed as a forgery, and also the Hoeft deed and Hadley mortgage, and for an accounting for the use and occupation of the premises and the timber cut therefrom.

Defendants Francis Crawford, the heir-at-law, Anna M. Crawford, the widow who took a life estate, and Edwin Hadley made no answer. Defendants Hoeft, Turnbull, administrator, and Miller and Rowley filed separate answers.

*Hoeft's answer.* Admits the deed and record, and denies the forgery; claims the complainant was in Presque Isle county since the date of the deed and allowed her son, down to his death in October, 1881, to have general control of the place and to sell and mortgage it as his own, and never abjected; denies any knowledge of the fraud, and charges he purchased in good faith for value, and without notice of any claim made to the same; relied on this deed and its record, and, though it was well known that he was going to purchase this property long before he did, complainant never informed him of any claim to the property nor objected to his buying it, notwithstanding the fact that she was then at the "Quarry" and knew of his afterwards making large improvements on the property; demurs on the ground that the bill is defective for want of necessary parties; that complainant is estopped by her own laches by having put this property into the hands of her son and allowing him to dispose of it as his own, and also in thus failing to notify him of her claim, though she knew of his purchase and being in possession of the property.

*Turnbull's answer.* Makes the same substantial defense as the Hoeft answer, but alleges the additional ground of

demurrer that, as complainant knew of the fraud in 1880, it is now too late to complain 'after her son's death, both as against his creditors as well as the bona fide purchasers of this property.

*Miller and Rowley's answer.* Says that they know nothing of the matters alleged except as to the mortgage; they admit its existence and record, but deny that Hadley had any knowledge of the fraud or that he was their agent in securing this loan, and aver that, relying upon his representations, they purchased this mortgage in good faith, and paid him therefor seven thousand five hundred dollars, without any notice or knowledge of the claim against this deed, and they allege that complainant is estopped by laches and by a deed of release executed to them January 26th, 1883, whereby she released to them all manner of right to question this mortgage and to further prosecute her suit against them.

General replications to the answers were filed, and the case is before us upon pleadings and proofs. It was first argued before us at the October term of 1884, and was held under advisement until the 9th of April, 1885, when an opinion was filed by the Chief Justice affirming the decree of the court below dismissing the bill of complaint.

It was there stated that the case contained a great deal of conflicting evidence which had given us no little trouble, but in considering the evidence, the majority of the Court did not feel fully assured that the forgery alleged in the bill had been established, but we felt quite well satisfied, as stated by the Chief Justice, "that the deed in question was made by complainant, who weakly suffered herself to be misled and defrauded by her worthless son." Mr. Justice Campbell did not agree with us in the conclusion which we had reached, and expressed the opinion that the deed complained of was not a genuine instrument. A rehearing was granted, and the case was at our last term ably and exhaustively argued by counsel for both parties. We have again read the printed record with care, and in addition have critically examined the original depositions and exhibits returned to this Court, and as we have come to a different conclusion from what we

before announced, I shall proceed to state the reasons therefor.

The main ground upon which relief is asked is the forgery alleged to have been committed by Leonard C. Crawford of the deed bearing date August 10th, 1878. In weighing the testimony bearing upon this point, it is proper to consider the relation which these parties bore to each other, their age, mental condition and the surrounding circumstances. The complainant is the mother of Leonard C. Crawford, and he is said by some of the witnesses to have been her favorite son. She was a lady over seventy years of age at the time the forgery is alleged to have been committed, and judging from her testimony her mind and memory must have been weakened by age, for it bears inherent evidence of intellectual decay and of the presence of infirmities incident to advanced years. She frequently contradicts herself and falls into errors without apparent cause. She was inquired of and testified to many things, such as admissions, conversations and transactions which were incompetent as evidence, being within the prohibition of the statute allowing parties to testify as witnesses in their own behalf. All such testimony we have excluded from our consideration. But the fact remains that she was a weak old woman, dependent upon the son for the management of her business and for the maintenance and support of herself, and that she placed great confidence in his integrity and disposition to do right in his transactions with her. In short, she had a mother's weakness for a favorite child. Her trust in him is illustrated by the testimony of Mr. Dowling, who was engaged by her to get a reconveyance of the property. She had accused her son of forging the deed, and Dowling had obtained the consent of the son to reconvey the property upon certain conditions more particularly referred to hereafter. Dowling says that he was not acquainted with the descriptions, and he read the deed which her son proposed to execute to her to ascertain if it contained all, and he says she did not seem to know, and she said: "I guess they are all there; if my son says so, it must be so."

Such being the relation of the parties to the deed claimed to have been forged, a transaction whereby, as it is claimed, the mother voluntarily made a conveyance of all her property, variously estimated to be worth from twelve thousand to fifty thousand dollars, to her son, must be characterized by the utmost good faith, and the burden of establishing the fairness of the transaction is upon those who claim under the conveyance. *Farmer's ex'r v. Farmer* 39 N. J. Eq. 211; *Condit v. Blackwell* 22 N. J. Eq. 481; *Porter v. Woodruff* 36 N. J. Eq. 174; *Tate v. Williamson* L. R. 1 Eq. 528; *Rhodes v. Bate* L. R. 1 Ch. App. 252; *Billage v. Southee* 9 Hare 534; *Cowee v. Cornell* 75 N. Y. 91. In the case last cited Mr. Justice Hand said: "It may be stated as universally true that fraud vitiates all contracts, but as a general thing it is not presumed but must be proved. * * * Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or on the other from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood."

It is entirely clear that up to August 10th, 1878, Mrs. Crawford was the owner in fee of the valuable property in question. It is not claimed or pretended that Leonard C. Crawford ever purchased this property from his mother or paid her any consideration therefor, and yet a deed bearing date the 10th day of August, 1878, is produced, which, if genuine, vests the title of the whole of this property in the son for the nominal consideration of two thousand dollars. He suddenly becomes the ostensible owner, and his mother at the same instant becomes ostensibly a beggar. The proposition is startling, and calls for an explanation of the transaction from

the son. He is accused of forgery and fraud, and what is the explanation he gives? To Mr. Carpenter he denied that he forged his mother's signature, but he admitted that he had obtained the deed by means perhaps ungracious, and justified himself by the plea that his brothers and sisters in Detroit had had more than their share of his mother's property; that there was some property in St. Paul that one of the children had the advantage of, and that he had worked hard at Crawford's Quarry, and that he thought the property there ought to belong to him. He also stated to Mr. Carpenter that the deed was taken to him entirely, only at the event of her death he should have it (the property) in preference to the other children. Mr. Carpenter then said to him that his mother now asked ,the property back; that he was invited up there by his mother, and he (Leonard) said the mother could have the property back upon this condition,—that upon her death she should give it to him in preference to the other children. To Mr. Dowling, another attorney employed by Mrs. Crawford to regain these lands, he said that his mother had claimed that she had never signed this deed, and he brought and exhibited to Dowling another conveyance to show the signature attached to it, and asked him to pass his opinion upon the two signatures as to whether they were alike or not. And he said: "This is the voluntary deed of my mother duly acknowledged and duly witnessed; there is no mistake about it whatever." Dowling further testifies as follows: "I told him that his mother had requested me to have a talk with him about the matter, and get him, if possible, to reconvey those lands to her, and he refused to reconvey them. He said his mother was getting old, and that she had disposed of most of her property, and she probably would dispose of those lands if he reconveyed them, and he did not think he had his share of her worldly wealth, and he intended to keep the lands and hold them under that deed, which was a voluntary deed on her part."

If the testimony of Emma Crawford, Emma C. Jouret and C. Stenton is to be believed, the proof of forgery would be clearly established. Each of these witnesses testify that

Leonard C. Crawford admitted in their presence that he had forged the deed in question, but at the same time they say that he asserted that he should rely on the deed and hold the property to the exclusion of the other children of Mrs. Crawford. It seems hardly credible that a person accused of forgery and threatened with a prosecution to recover the property should so freely admit away his title to it, and at the same time express his determination to hold the property under the deed. Yet these statements may each and all be true. It may be possible that he boldly asserted to his sisters Mrs. Jouret and Mrs. Stenton that he had forged the deed and meant to keep the property, relying upon their desire to avoid a public scandal and disgrace in the family, and also upon his mother's fondness for him, to prevent a prosecution. If so, it exhibits a daring hardihood and a reckless disregard of consequences seldom met with outside of the criminal classes.

In reaching the conclusion that the deed in question is a forgery, I have laid aside the testimony of each of these witnesses as tinctured with an evident bias. The witnesses who were present at the transaction all agree that, at about the time this deed bears date, Mrs. Crawford signed her name to a certain instrument to which Mrs. Crawford and her son Leonard were parties; they all agree that Mrs. Williams was present on that occasion; they all agree that Mr. Alexander McDonald was a witness called to witness the signature of Mrs. Crawford to the paper then signed by her. The deed in question appears to be signed by Mrs. Crawford, and to be witnessed by Philip O'Farrell and A. McDonald, and the acknowledgment appears to have been taken before Philip O'Farrell as a notary public. The witnesses disagree as to the kind of paper then signed, as to its appearance, as to who were present, and as to what transpired on that occasion. It is to be remarked, however, that all agree that but one deed was ever made or executed of any lands in Presque Isle county between Mrs. Crawford and her son Leonard that Mr. McDonald was a witness to.

Mrs. Williams testifies that there were present Mrs. Craw-

ford, her son Leonard, Mr. McDonald and herself, and that
O'Farrell was not present.   Mr. McDonald testifies that Mrs.
Crawford, Leonard, Mrs. Williams, O'Farrell and himself
were present.   Mr. O'Farrell testifies the same as McDonald.
He also testifies that he was there at the request of Leonard,
who told him to prepare the deed of all Mrs. Crawford's
lands that had not been conveyed, and told him his mother
was going to deed these lands to him.   He says he told
Leonard that he did not think his mother would, because he
had heard her speak to the contrary some time before; that
he drew up the deed and took it to Mrs. Crawford's place to
have it signed; that he spoke to her, and that she consented
to sign it; and that he was greatly surprised.   He says:

"In fact I told somebody that I would not be surprised if
she had shot me more than I was when she consented to sign
it.  So I took her into a room of the house—at least, arranged
to get her in there—and I explained it to her.   Of course, I
don't remember now what language was used; but I am very
positive that my intention was to tell her that she was giving
him what property she had in Presque Isle county.   She
went on to tell what he had promised to do with reference
to giving her a certain amount of money—I don't remember
the amount—and to make provision for the support of her-
self and his father, her husband.   There was some talk about
where the father should stay, whether it was to be in Detroit
or up there, and they came to some conclusion about it, but
I don't remember what it was; and I don't know as I would
remember as much as I do only for my surprise about her
signing such an instrument at all.   Well, then there was
something said about what security she would have that he
would carry out his agreement with her, and my recollection
is, although I would not be very positive about it, that I
suggested drawing up a bond or a contract, or something to
that effect, and for him to give her a mortgage on the prop-
erty to secure her in his carrying out this agreement about
this support and money, and so on; but what became of that,
or whether it was done there and then, I have no definite
recollection.   Then I remember that we went into another
room, and in fact walked from one room to another talking
about the matter.   Mrs. Williams was called from another
room, or from up stairs, in the same house, to be as a witness,
and when Mrs. Williams came down she was called upon to be

a witness.  I don't remember who spoke to her about it, or I don't remember who called her from up stairs, or wherever she was, but I remember the objection she made, saying she was friendly with the other members or branches of the family, and that she thought that this document would be taking property in Presque Isle county away from them— from the Detroit parties—and that she was going down to Detroit in a very short time; and that it would be bad policy for her to have anything to do with it.    She spoke a good deal about how she loved the family; and loved one as well as another; and went on in a woman-like way, and said she didn't want to have anything to do with it, so Mr. McDonald was called in.    It was spoken about going to get somebody, and I think it was Len. that said he was in the store, and that he would get him; and yet my recollection is that he sent for him and brought him in.    When he came in, Mrs. Crawford spoke something about the matter; it was generally spoken about there; and Mrs. Crawford said something to Mrs. Williams—I don't remember what it was—as to why she would not be a witness.    But I know that the paper was signed there by Mrs. Crawford, and I signed as a witness, and I saw Mr. McDonald sign as a witness.    Of course, I would not remember that that Exhibit A is the paper any more than that I do remember when I read the description and remember the time I had arranging to get it into such a condensed form, and it suggests to my mind that it is the paper, because I saw papers drawn up by Mr. Hunt of about the same purport, which were very voluminous; and I know I made it a point to get it in without any repetition in drawing the body of the paper; and my best recollection is that that is the one; and I do know that that is my signature as a witness on it.    Well, the paper was signed, and there was something said, but by whom I don't remember, about how unwise it would be to put it on record, as Mr. Crawford had been in business there before, and there was some debts hanging over him, and likely it would induce his creditors to commence proceedings against him.    There was something said about how that could be avoided, but the details of that I cannot remember.    But I know after the business was transacted I went away, and I have no distinct recollection of hearing anything about the whole affair until, well, some months or such a matter; I don't remember exactly."

On his cross-examination he testified that there was talk of a trust deed, and something was said about the respective

merits of a trust deed being given by the mother, and an absolute deed and mortgage back. No one can read the testimony of this witness without reaching the conclusion that, by the transaction as he details it, an unconscionable advantage was taken of the old lady, which, under the circumstances, amounted to a positive fraud upon her. By his story she was weak, trustful and confiding. The papers were executed under the understanding that she was to have security back by way of " mortgage for her support, and money, and so on," and yet no security was given. As soon as he had secured the deed nothing further was done ; and he seems to have lost suddenly his solicitude for the old lady's welfare. But the story he tells is not true. He is directly contradicted by Mrs. Crawford and by Mrs. Williams, and inferentially by McDonald, who testifies that he was a friend of Leonard and was in partnership with him in 1878 ; that he had talked with Leonard about his trying to induce his mother to make a deed or give him some portion of her property ; that he talked with both of them upon the subject, and it was agitated for two or three months to his knowledge ; that the deed talked of was to be a trust deed, securing in the same instrument the payment to her of three hundred dollars in cash every year, and her support, and also the support of his father if he would remove to the " Quarry," and reside there ; that the deed was not to be placed upon record ; that she always insisted upon reserving from the deed section twelve and the homestead ; that he was afterwards called in to Mrs. Crawford's by Leonard to witness the signature of his mother to a deed, which he supposed to be the trust deed talked about; that he did not read the paper and could not identify it, but did identify his signature as a witness ; that he had the impression that the paper he witnessed was written upon legal cap paper ; that Mrs. Williams was present and asked to witness the paper, but declined because she was about to leave for Detroit, and while in Detroit she wanted to visit among the Crawfords, and she didn't want to be a party to any transfer for fear it would make her enemies ; that from what was said he knew that the paper he witnessed

was a transfer of the Crawford property from Mrs. Crawford to Leonard, and that something was said about not putting the deed upon record; that he never witnessed the signature of Mrs. Crawford but once. This witness also testifies that, so far as he knows, Mrs. Crawford was perfectly satisfied. He says that afterwards Leonard told him he had left the deed in charge of the register of deeds, with instructions not to place it upon record until he notified him.

In this connection, the testimony of the register of deeds is noteworthy. He says that he was elected in 1876, and occupied the office in 1877 and 1878; that in the summer of 1878 O'Farrell told him that Leonard C. Crawford would bring a document to be put in his possession for safe keeping, and that he should preserve it and keep it in his possession, and not put it on record until he was told to, or something to that effect, and that Crawford would pay for keeping it safe; that a few days afterwards Crawford brought to him a warranty deed, a bulky paper written on legal cap, from Cynthia W. Crawford to Leonard; that he looked it over, and took it into his possession for safe keeping; that it took in all the lands in Presque Isle county belonging to Mrs. Crawford; that he thinks O'Farrell took the acknowledgment, and that McDonald was a witness. Crawford told him not to put it upon record, because he was in such a position that there were some judgments hanging over him, and he did not want to put it on record. He said he would be in a good position soon, and pay up all; that he looked it over very carefully, and discovered a mistake in the descriptions, and spoke to Crawford about it, and he took it, and said it would be fixed again, and he never saw that paper again. It was in O'Farrell's handwriting. Afterwards he received another deed from Crawford, it being the deed now claimed to be a forgery. He told the witness to keep it in some way, not to put it on record; that he was in such position that everybody was watching him, and he did not want it to be put on record, and to put it on when he gave notice; and a few months after he told him to record it, and he did so on the 30th day of December, 1878. It will be noticed that this was the day

before his official term would expire. He afterwards gave the deed to Crawford. It appears that the index of this deed in the index of deeds required by law to be kept by the register was so indexed under the initial C that its presence would not be ascertained except by the merest chance. There were twenty-seven lines upon which no entry had been made upon the last page occupied by entries of names commencing with the letter C, and the entry of this deed was over the leaf. It was some time after the register who went into office on January 1st, 1879, discovered by accident the entry, although he had searched for conveyances and incumbrances of this property previously without finding any.

Mrs. Crawford did not discover the existence of this deed until the spring of 1880, when she promptly repudiated it and pronounced it a forgery. From that time on she seems to have endeavored to obtain a reconveyance. She is charged with laches, but whether she is guilty of laches must depend in a great measure upon her opportunities, her surroundings, the relationship of the parties, and the efforts she put forth to obtain a reconveyance. At the " Quarry " she was in the hands of her son, and was completely helpless. The members of the legal profession, so far as we are advised, residing at the "Quarry" or at Rogers City, were in the employ of her son. The only way that she could put the public upon notice of her rights was to talk, and from the evidence it appears that her tongue was not idle. She denounced the deed as a forgery to all whom she met. She wrote to the register of deeds forbidding him to record any conveyances from her son, for the reason that the deed had been obtained by fraud—a futile thing to do, but she was doing what she thought she could do to give notice. She besought Mr. Carpenter, an attorney, and relative of the family, to see her son, and he did so, but without result. She employed Mr. Dowling, an attorney in Detroit, and he, about the middle of October, 1880, visited Crawford's Quarry, and after a protracted negotiation obtained an agreement from Leonard that he would reconvey by quitclaim deed all the lands covered by the deed of August 10th, 1878, but on

condition that the same should be deposited with William A. Moore in escrow, subject to the conditions endorsed thereon, as follows :

" The conditions referred to in the within deed, and hereby mutually agreed upon, are these : That this deed shall be placed in escrow with Wm. A. Moore, Esq., of Detroit, Mich., to be by him retained, without filing, recording, or publicity, until the death of said Leonard C., or of said Cynthia W. Crawford. That if said Leonard C. Crawford dies first, then, on said Cynthia W. Crawford paying in. *cash* to the widow of said Leonard C. Crawford one thousand dollars, said deed shall be delivered up to her, said Cynthia W. Crawford, and not before. That in case of the death of said Cynthia W. Crawford before said Leonard C. dies, then this deed shall forthwith, upon her death, become null and void, and shall be forthwith delivered up to said Leonard C. Crawford.

Dated Crawford's Quarry, Presque Isle county, Mich., October 16th, A. D. 1880.

LEONARD C. CRAWFORD.
CYNTHIA W. CRAWFORD.
By M. E. DOWLING, her Attorney."

This deed bears date October 16th, 1880, and at the time of its execution Dowling was not informed of any deeds or mortgages having been executed upon the property. But it turns out that this settlement was a fraud upon the rights of Mrs. Crawford scarcely less heinous than the forgery of the deed in the first instance. For, while Leonard C. Crawford was negotiating with Dowling for a settlement of the matter with his mother, and while ostensibly yielding to her a portion of her rights, he was secretly conveying away and incumbering the whole of the property beyond the means and reach of his mother. To use a familiar quotation, he was "keeping the word of promise to her ear to break it to her hope." At the time he was preparing the quitclaim deed to his mother he was also preparing for execution a deed for an undivided half of the quarry property to Herman Hoeft, and a contract of partnership by which the whole of the quarry property should be put into the firm as assets for ten years, and a mortgage to one Edwin Hadley upon all of the

other property, to secure the payment of eight thousand dollars, which it was intended Hadley should negotiate for Leonard's benefit. These papers were actually drawn and delivered before the execution of the deed to Mrs. Crawford, which was to be placed in escrow, and which has expressed therein that it is executed "*for and in consideration of the natural love and affection to said second party his mother.*" But more than this, he left out and kept back all of section twenty-four, upon which the village and the quarry is situated. This settlement and deed Mrs. Crawford also repudiated ; and she refuses to be bound by the settlement made by Dowling. In this she is justifiable, not only because of the fraud perpetrated upon her in executing the conveyances above mentioned, but because the settlement, so called, gave her nothing whatever of value. It imposed a burden upon her in order to obtain what was her own.

The testimony of Mrs. Williams has certain peculiarities which incline us to weigh it with caution, yet upon the facts attending the execution of a deed by Mrs. Crawford when McDonald was present, she is clear as to the nature of the instrument and the object to be accomplished thereby. She testifies that O'Farrell was not present at all on that occasion ; that the property conveyed was simply the quarry property, with a reservation ; that it was but a single sheet, and with but little writing upon it, and she is positive in her statement that the deed in question is not the deed which she saw on that occasion. She also testifies to being present at interviews previous to the time the deed was executed between Mrs. Crawford and Leonard, in which he importuned his mother to deed him the land, and that she refused to do it, but finally consented to execute a quitclaim deed which should stand in the place of a lease, so he could carry on business, for which he was to support her and her husband if he should remove to the "Quarry" to reside, and pay her three hundred dollars annually, which deed should not be placed on record. And this, she says, was the deed which was executed at that time.

The evidence above referred to was before us on the

former hearing, and was duly considered, and although we were satisfied therefrom that a fraud had been perpetrated, it did not appear clear to the majority of the Court that the instrument complained of was a forgery. It appeared to us that the signature appended to the deed was the genuine signature of Mrs. Crawford, and I am still of that opinion. The forgery, if one existed, could not be readily discerned. Since the last argument, however, we have made a careful examination of the deed alleged to have been forged, and have discovered what to us appears conclusive that a forgery of the deed has been committed, when viewed in the light of the testimony of the witnesses as to the character of the deed which was executed by Mrs. Crawford to her son at the time Mr. McDonald and Mrs. Williams were present, and the other testimony in the case bearing upon the genuineness of the deed in question. The deed produced, and which it is claimed is a forgery, is filled out upon the printed form known as the long form warranty deed, upon sheets folded at the end like legal cap paper, having marginal red lines ruled upon both margins of the pages of the sheet. The first half of the sheet embraces all of the deed, including the description of the premises conveyed, except the attestation clause and the acknowledgment. To a person desiring to perpetrate a fraud by substituting a spurious conveyance for a genuine, this form affords unusual facilities. All such evil-disposed person would have to do would be to sever the sheet in the middle and attach the half sheet which has the genuine signature and the genuine signatures of the witnesses and acknowledgment to a half sheet of like form containing the spurious description. The deed in question, although executed as claimed in 1878, has a very dilapidated appearance. It is worn and dirty. It appears so worn as to become separated at each fold, and has been attached together by the aid of paper and mucilage. The edge where the half sheet was folded had been severed, and was also securely attached together by the same means. On detaching this mucilaged paper it was found that the edges of the half sheet were smooth and had no appearance of having been worn like the other folded

edges. It also is apparent that they are not the halves of the same sheet of paper. One is wider than the other, and the marginal red lines do not correspond with each other. It is manifest that the half sheet which contains the description of land conveyed is not a part of the sheet upon which the attestation clause and signature of Mrs. Crawford and the names of the witnesses appear. We are satisfied that the first half sheet of the present deed was substituted in place of some other deed executed by Mrs. Crawford, and is spurious and a forgery.

We are also satisfied that the complainant has lost no rights as against these defendants by her laches. The defendants can claim no rights under the forged deed. If they occupy the position of innocent purchasers, they are in no better condition to contest her rights than if they purchased with notice. Her equity is prior and superior to theirs, based alone upon conveyances from the forger. If Hoeft is an innocent purchaser, which it is not necessary to pass upon, since we hold that the deed was forged, he can recover the land conveyed by him to Crawford, if not voluntarily surrendered by those claiming under Crawford.

We are also satisfied from the testimony that the release executed by Mrs. Crawford to Miller and Rowley is valid and effectual, and that in consequence thereof their rights under the Hadley mortgage cannot be disturbed.

The decree of the circuit court is reversed, and a decree will be entered here in accordance with the prayer of the bill, except as to Miller and Rowley, and as to them the bill will be dismissed, but without costs. The decree will also be drawn so as not to affect the rights of any person who is not a party to this suit. Complainant will recover the costs of both courts.

CAMPBELL and SHERWOOD, JJ., concurred.

Motion for rehearing. Overruled November 19.

*Turnbull & Dafoe* for the motion. A judgment obtained by fraud can be set aside on motion seasonably made: *Jenni-*

*son v. Haire* 29 Mich. 219; the most flagrant fraud is one that is practiced on a court under forms of law : *Gallatia v. Erwin* Hopk. 54; any intentional device to keep the parties or the court in ignorance of facts avoids the judgment : *Patch v. Ward* L. R. 3 Ch. App. 203; Kerr on Fraud 293–4; *Duchess of Kingston's Case* 20 Howell's State Trials; Bigelow on Fraud 172; so may suppression or concealment : *Davis v. Tileston* 6 How. 114; *Van Cortlandt v. Underhill* 17 Johns. 405; *Bulkley v. Starr* 2 Day 552; *Fenemore v. United States* 3 Dall. 357; courts will set aside as nullities, judgments, decrees or awards obtained by fraud (*Willson v. Foree* 6 Johns. 110; *Jackson v. Hayner* 12 Johns. 469; *Barber v. Kerr* 3 Barb. 150; *Clark v. Underwood* 17 Barb. 221; *Wright v. Miller* 4 Seld. 9; *Weed v. Bentley* 6 Hill 56) occurring in the concoction or procurement of the result : *Ross v. Wood* 70 N. Y. 9; a former adjudication may be avoided by showing that the court was misled : *Mandeville v. Reynolds* 68 N. Y. 543; or that the matters determined were not within the issues : *Campbell v. Butts* 3 N. Y. 173; equity will interfere with the execution of a judgment if it would be unjust : *Dobson v. Pearce* 12 N. Y. 165; fraud vitiates a judgment when in consequence of it the judgment is different from what it would have been otherwise : *Verplank v. Van Buren* 11 How. 328.

*Bates* against.

CHAMPLIN, J. Motion was made in this case on behalf of defendants Herman Hoeft and James D. Turnbull, administrator, to vacate and set aside the decree entered therein, or for leave to file a bill for that purpose, on the ground of fraud practiced upon the Court by the complainant's solicitor in obtaining the decree. The motion is based upon a portion of the opinion of the Court, wherein mention is made of the appearance of the deed from Cynthia W. Crawford to Leonard Crawford, alleged to have been forged, as justifying, in connection with the other testimony in the case, the conclusion to which the Court arrived that the deed was forged. Affidavits have been filed in support of the motion, in which the affiants state that at the time they saw the deed, and before it was introduced in evidence, such deed consisted of a whole sheet, not severed at the center fold, and hence a half sheet

of one deed could not have been substituted for another, as intimated in the opinion of the Court.

No claim is made that the deed returned and remaining on file in this Court is not the identical deed which was introduced in evidence, or that any change or alteration has been made therein, except that it has become worn and its parts pasted together to preserve them. It appears that the instrument has been taken to Denver and exhibited to the witnesses whose depositions were there taken, and also to Chicago for the purpose of exhibiting the same to Mrs. Williams, another witness; and it is quite possible that this may account in a measure for its pocket-worn appearance; but it does not account for the fact which still remains, that one half of the sheet is wider than the other, nor that the marginal lines, which should be continuous and of the same width apart in a whole sheet, are not so in these two half-sheets when placed together. It may be possible that these discrepancies might occur in cutting and ruling the paper, but it is not very likely that both should concur in the same sheet. Be this as it may, the affidavits fail entirely to show, and there is no ground for asserting, that the complainant's solicitor intentionally or unintentionally practiced or attempted to practice a fraud upon the Court with reference to the appearance or condition of the deed in question.

The motion is overruled with costs.

The other Justices concurred.

Motion for writ of restitution. Submitted February 2, 1886. Denied February 17.

*Bates* and *Russell* for the motion.

*Turnbull* against.

CHAMPLIN, J. Motion is made for a writ of restitution to be directed to the defendants Herman Hoeft, Francis Crawford, Anna M. Crawford and James D. Turnbull, administrator, etc., commanding them to deliver up the possession of the

premises described in the bill of complaint, and particularly the premises known as fractional section number twenty-four (24) in township thirty-five (35) north, range five (5) east in Presque Isle county, Michigan. The motion is based upon the records and files in the cause and the affidavit of George W. Bates.

It appears that the parties above named are in possession, and since the entry of the final decree in this Court in said cause possession has been demanded from the defendants in behalf of complainant and defendants refuse to deliver up possession until compelled to do so by the order of this Court. On the hearing of this motion it was urged in behalf of the defendant Hoeft, that he had a right to hold possession until put out by an action of ejectment, in which action he could have the value of the improvements claimed to have been made by him valued by a jury, and he be compensated therefor; and further that this Court has not jurisdiction over the case, as under the statute the files and record have been transmitted to the court below, and the application, if proper at all, should be made in that court where the record now is.

We have no doubt of our authority to issue all writs necessary or proper to enforce our decree; but we think the court below to which the record has been returned has the power and authority to issue the writ of restitution to put defendants out and put complainant in the possession of the premises described in the decree. The deed under which the defendants claim rights and under which they obtained possession was declared by the decree of this Court to be a forgery and void. The defendants cannot claim any rights as having been conferred by such deed, and the complainant is not obliged to resort to the action of ejectment to obtain possession of the premises which this Court decreed to be hers. The complainant is entitled under the decree of this Court to the immediate possession of the land described in the decree, and to a writ of restitution from the court below on an application properly made to that court. We therefore deny the

motion here, with leave for her to apply to the circuit court for the county of Presque Isle in chancery for such writ.

No costs will be allowed to either party on this motion.

The other Justices concurred.