# JUNE TERM, 1913.

LONGENECKER *v.* GRAHAM.

1. DEEDS—INSANE PERSONS—COMPETENCY—UNDUE INFLUENCE.
   Evidence considered and *held*, to sustain the finding of the circuit court that complainant executed a certain deed by reason of undue influence and mental incapacity.

2. SAME—RATIFICATION.
   *Held*, also, that a contract ratifying the instrument made while the probate court had jurisdiction of a petition to adjudge the grantor incompetent, did not validate the deed, where a guardian was later appointed and continued to act until discharged by order of the probate court.[1]

Appeal from Kalamazoo; Knappen, J. Submitted April 15, 1912. (Docket No. 82.) Decided July 9, 1913.

Bill by Margaret Longenecker and others against Sarah E. Graham and others to set aside a deed. From a decree for complainants, defendants appeal. Affirmed.

*James M. Powers,* for complainants.

*Stewart & Jacobs,* for defendants.

MOORE, J. Abraham Longenecker, the husband of the complainant, Margaret Longenecker, and father of the other complainants and of the defendants Sarah

---

[1] As to the validity of a deed by an incompetent person, see note in 19 L. R. A. 489. And on the question whether a deed of real property executed by an incompetent not judicially declared such may be avoided in action at law, see note in 19 L. R. A. (N. S.) 461.

E. Graham and Mary Smith, died December 11, 1899. All of the parties to this litigation were of full age at the time of his death. Prior to his death Mr. Longenecker was the owner of 240 acres of land. A few weeks before his death he made arrangements to divide his property among his children by giving to each 40 acres of land, with the exception of his daughter Mary Smith, to whom he gave $1,500 in cash in place of land. In attempting to carry out such arrangements, Abraham Longenecker on the 8th day of November, 1899, employed Mr. E. W. Wilcox to prepare deeds of all of his land, subject to a life estate in Margaret Longenecker, and he also made arrangements to have $1,500 paid to his daughter Mary Smith. In making these deeds Mr. Wilcox made a mistake in the description of the land in the deed to Benjamin S. Longenecker and Clara Snell, so that, instead of conveying all of his land, Mr. Longenecker left 40 acres not conveyed to any one. To show the descriptions of the several parcels of the Wakesham farm and the persons to whom the several parcels were to be conveyed, Abraham Longenecker drew a diagram of the farm and marked on each parcel the initials of the persons to whom the conveyances were to be made. That diagram was introduced in evidence on the hearing, and the initials were shown to be in the handwriting of Abraham Longenecker. It was shown that the initials on the diagram, "G. W. L.," were meant for George W. Longenecker, the initials "S. G." meant the defendant Sarah E. Graham, and the initials "B. & C." meant his son and daughter Benjamin S. Longenecker and Clara Snell. After the deeds were executed they were handed to Mr. Longenecker, and kept in his possession until November 27, 1899.

It is claimed by the complainant that after the deeds were drawn and before November 27, 1899, Mr. Longenecker discovered that the deed to Sarah E.

Graham was not as he desired it to be, and he had a new deed drawn to her on the 27th day of November, 1899, of "the northeast quarter of the northwest quarter of section thirty-two, town four south, range nine west. My wife Margaret Longenecker, shall have the use and benefit of said land with all rents as long as she shall live." This deed was made to Sarah E. Graham for her lifetime, at her death to be equally divided between her children, but subject to the life estate of Margaret Longenecker.

It is also said this deed was drawn by Mr. Kingsley. Abraham Longenecker gave him the former deed from which to get the description and directed him to burn the other deed, and he did burn it. At the time the deed was executed to Sarah E. Graham, November 27, 1899, none of the deeds had been delivered, but they remained in the possession and control of Abraham Longenecker. After the new deed was drawn to Sarah E. Graham and the former deed burned by Mr. Kingsley, Mr. Longenecker handed them to his son Adam, and told him to see they were put on record after his death and delivered to the parties; and after the death of his father Adam Longenecker had them recorded and delivered them to the different parties as directed.

That part of the decree from which an appeal is taken which it is necessary to quote reads as follows:

"III. That the quitclaim deed executed by Margaret Longenecker, one of the complainants in this cause, to the defendant Sarah E. Graham on the 23d day of September, A. D. 1905, of the northeast quarter of the northwest quarter of section number thirty-two, town four south, range nine west, is hereby decreed to be null and void and of no effect and the same is hereby canceled, and the complainant Margaret Longenecker is hereby decreed to have the right to the use and benefit and possession of said land last above described from and after the 27th day of November, A. D. 1899; and for and during her natural

life, and after the death of the said Margaret Longenecker the said defendant Sarah E. Graham is hereby decreed to have the right to the use and possession of said land for her lifetime, and after the death of said defendant Sarah E. Graham the same to be equally divided between the children of said Sarah E. Graham, in accordance with the terms of the deed of the land last above described executed by Abraham Longenecker to Sarah E. Graham, and recorded in the office of the register of deeds of Kalamazoo county, Michigan, on the 14th day of December, A. D. 1899, in Liber 106 at page 370."

"IV. And it is further ordered, adjudged and decreed that the contract entered into between Margaret Longenecker, Adam Longenecker, Benjamin S. Longenecker and Sarah E. Graham on the 24th day of October, A. D. 1905, a copy of which is set forth in the twentieth paragraph of the bill of complaint in this cause, be and the same is hereby canceled, and said contract is hereby decreed to be null and void."

"V. And it appearing to the court from the pleadings and proofs in this cause that at the time of the execution of the quitclaim deed of the northeast quarter of the northwest quarter of section number thirty-two, town number four south, of range nine west, by the complainant Margaret Longenecker to the defendant Sarah E. Graham, she, the said Margaret Longenecker, paid to said defendant Sarah E. Graham and Louis E. Graham, the sum of $600, which payment of said sum was procured by the fraud, false representations and threats of said Louis E. Graham and Sarah E. Graham and was without consideration: It is therefore further ordered, adjudged and decreed that the said defendants Sarah E. Graham and Louis E. Graham pay forthwith to said complainant Margaret Longenecker the sum of $600 and interest thereon at the rate of 5 per centum per annum, from the 23d day of September, A. D. 1905, to the date of this decree, amounting in all of principal and interest to the sum of $767.50 and interest thereon at the same rate until the same is paid."

"VI. And it is further ordered, adjudged and decreed that the temporary injunction issued in this cause on the 18th day of May, A. D. 1910, restraining the defendant Sarah E. Graham and John C. Davis,

justice of the peace, from proceeding with the trial of the action at law, commenced before said John C. Davis, one of the justices of the peace of the city of Battle Creek, Calhoun county, Michigan, on the 25th day of April, A. D. 1910, by the defendant Sarah E. Graham against the complainant Margaret Longenecker, until the further order of this court be and the same is hereby made permanent, and the said defendant Sarah E. Graham is hereby perpetually enjoined from proceeding further with said action at law before said John C. Davis, and from prosecuting the same in said justice's court or in any other court against said complainant Margaret Longenecker for the same cause of action."

Mr. and Mrs. Graham claimed that the first deed to Mrs. Graham, which was drawn by Mr. Wilcox, of 40 acres of land was in fee simple, absolute, without any reservation of the life estate to Margaret Longenecker, or any one else, and they claimed that Adam Longenecker had destroyed the deed to Sarah E. Graham made on November 8, 1899, and had procured his father by undue influence to execute the deed of November 27, 1899, to Sarah E. Graham, reserving a life estate to the widow, and to Sarah E. Graham for her lifetime after the death of Margaret Longenecker, and at the death of Sarah E. Graham to be equally divided between her children. To show this they took the deposition of Mr. Wilcox, but he testified that Mr. Longenecker directed him to draw all the deeds subject to a life estate in Mrs. Longenecker, and that he believed he so drew them. Mr. and Mrs. Graham, under circumstances hereafter stated, procured from Mrs. Longenecker a quitclaim deed of the 40 acres of land conveyed by Abraham Longenecker to Sarah E. Graham by the deed of November 27th, and $600 in cash which they claimed for the use of the land from the time of the death of Abraham Longenecker. This deed bears date September 23, 1905, and the $600 in cash was paid by her at or about that time.

When Margaret Longenecker's other children found she had made the quitclaim deed and paid the Grahams $600, and on or about the 27th day of September, 1905, a petition was filed by them in the probate court of St. Joseph county for the appointment of a guardian for Margaret Longenecker as mentally incompetent to have the control of her person and property, and alleging that she was the owner of a life estate in 160 acres of land valued at $500 per year or thereabouts. While this petition was pending in the probate court and on or about the 24th day of October, 1905, Mrs. Longenecker was induced to sign a contract, which is spoken of later as a ratification of the deed, which she asks in her bill of complaint to have canceled as well as the quitclaim deed. Sarah E. Graham and her husband, Louis E. Graham, opposed the appointment of a guardian, and it is their claim this contract was understandingly made. After the contract was signed, the probate court for St. Joseph county made an order adjudging her to be mentally incompetent, and appointed a guardian. Mr. Barnabee qualified as guardian and acted as such until on or about June 25, 1908, at which time the probate court made an order discharging the guardianship. Mrs. Longenecker refused to recognize the quitclaim deed and the contract, and this litigation resulted.

It is conceded that the decree correcting the mistakes in the descriptions of land other than the 40 acres relating to Mrs. Graham, should stand. Mrs. Graham insists that she should be decreed to be the owner of the 40 acres and that the contract made between her mother and herself should stand.

Counsel say in the brief:

"The disputed issues included in the portion of the decree not consented to are those involved in the controversy between Margaret Longenecker and the defendants. They are:

"*First.* Was Margaret Longenecker mentally com-

petent to enter into an agreement adjusting the claim of Sarah E. Graham on or before September 15, 1905, and to carry out that agreement September 15 and 23, 1905?

"*Second.* Did Margaret Longenecker voluntarily make such agreement and was its fulfillment voluntary on September 15 and 23, 1905?

"*Third.* Were the transactions of September 15 and 23, 1905, void for want of consideration or by reason of fraud or duress?

"*Fourth.* Were the deed and agreement of September 15 and 23, 1905, subsequently confirmed and ratified by Margaret Longenecker, Adam Longenecker, and Benjamin Longenecker by the agreement of October 25, 1905?   *   *   *

"*Sixth.* After her release from guardianship did Margaret Longenecker recognize Sarah E. Graham's right to the land in question by her refusal to allow her tenant to cultivate it and by giving her written consent to let Mrs. Graham lease said land?"

The first three of these propositions may be discussed as one.

The record shows that Mrs. Margaret Longenecker, who was then upwards of 70 years of age, had been very ill during 1905. It also shows that after her husband had procured Mr. Wilcox to make the deed he procured Mr. Kingsley to make another one of the 40 acres to Mrs. Graham and caused the Wilcox deed to be burned. It also appears that Mr. and Mrs. Graham insisted this change was not the act of her father, but charged it to one or more of the brothers of Mrs. Graham, and following this claim they procured the quitclaim deed and money from Mrs. Longenecker.

The testimony of Mrs. Margaret Longenecker and of Mr. and Mrs. Graham as to what occurred at the house of Mr. Ernst just before Mrs. Longenecker made the quitclaim deed, is conflicting.

The testimony of the Misses Ernst is illuminating. We quote the material parts of the testimony given by Lillian Ernst:

"I certainly recollect in the month of September, 1905, of Mrs. Longenecker visiting at our house in Mendon. She came the 15th of September. She came just to make her visit that she usually makes about twice a year. My sister married her son George Longenecker. While Mrs. Longenecker was staying at our house on that occasion, Mr. and Mrs. Graham came there. I imagine about half past 2 o'clock or about 2 on the 23d, Saturday. Mrs. Longenecker was sitting by the window looking out and said, 'There comes Lew and Sadie, I wonder what they are coming for.' They came into the house. They said they had come to take grandma home. She said she was not ready to go home. She told them she was not ready to go. They came in and were as pleasant and nice as could be. Talked about everything and about our work and about the weather and everything of that sort and wanted to go out to the garden and look at the flowers and we went out in the garden and walked around there. They were as nice as could be until it began to get dark, then they wanted she should go home with them and we told them she had just come and her visit was not out and we wanted to keep her as long as we could, and when they saw she was not going that way they simply tried to force her to go. They asked if they could have a private room where they could talk with her. My sister was in the parlor unable to leave her chair, she had been very sick, and there was no door between the parlor and sitting room, and I told them they could go into the dining room if they liked, if it was necessary, and they went into the dining room and closed the door. We heard nothing but loud, angry voices, talked loud in a threatening way until we were very much frightened too. We could only distinguish one sentence. We distinctly heard him say: 'If you don't do it I will ruin the boys.' Graham said that. There was no one else in the house with us except Mr. and Mrs. Graham and Mrs. Longenecker. I should judge they remained in the room about 15 or 20 minutes. When they came out of the room Mrs. Longenecker had been crying, and she was very much upset and was nervous. She could hardly walk. When she came out of the room she said, 'I will have to go home with them. They told me if I didn't go they would

ruin the boys.' At the time she said that Mr. and Mrs. Graham were in the dining room and the door was open, and they came out behind her. I think they were near enough so they could hear what she said. When they came out of the dining room and Mrs. Longenecker concluded to go home with them I imagine it was quite a bit after 4 o'clock, getting dark in September between 4 and 5."

Dora Ernst testified substantially the same.

Mrs. Longenecker testified that the Grahams threatened her:

"Then he told me that he wanted me to give him a deed of the land and that he would ruin my boys if I didn't. In the first place I said I wouldn't and declared I wouldn't. At last I gave up to him and told him I would give it to him if he would let the boys alone. I told him he was not entitled to it. I was excited and crying while I was in the room there. The Ernst girls were in the other part of the house, but they heard. The door was closed between us, but they heard all about it, or something about it. You can ask them. After remaining in the room for some time I went home with them. We got home about night. They were living in Leonidas at that time. They kept dinging about it, they said they wanted to have that. Lew Graham said he knew it was meant for him and his wife, that her father meant it so, and that was not true. When he said he knew her father meant it so I said I knew he didn't. They made threats after they got to their home. They didn't just threaten, of course. I suppose they would have. I just stuck to it and said I wouldn't do it. I finally signed the quit-claim deed to Mrs. Graham, of course, I had to sign it."

Mr. Graham and his wife deny there was loud talking.

Mr. Graham testified in part:

"There was no loud and angry talk there on my part and the part of my wife. I did not say to Margaret Longenecker, 'If you do not do it we will ruin the boys,' I did not say it in that way. I said if she did not want to do it, it might ruin the boys. I simply told

her we would test out that deed just as she said it was.
* * *

"*Q.* Why was it necessary for you to say to her there at Ernst's if she did not do it, it might ruin the boys?

"*A.* Because we made up our minds we would have it just as she wanted it, and have it done there and while I could show just what I knew about it being changed. While there at Ernst's she did not refuse to sign the deed, she did not refuse until the next day and didn't refuse at Ernst's place."

Mrs. Graham testified in part:

"I don't know as Mr. Graham was angry while in the dining room. He was angry at being treated the way we were about our grocery bill, most any one would be. He was angry at my brother. I don't think he talked in a loud and angry voice to my mother. While in the dining room I think Mr. Graham said to my mother, 'If you don't do it we will test those deeds and that might ruin the boys.' Those are the words he said. When he said it might ruin the boys I don't know what my mother said."

There was much other testimony which it is not necessary to quote. It will be observed that the Grahams were asserting a claim contrary to the writings made by Mr. Longenecker, and contrary to the testimony of their witness, Mr. Wilcox. We think it clear these papers were obtained from Mrs. Longenecker under such circumstances they ought not to stand. See *Seeley* v. *Price*, 14 Mich. 541; *Wartemberg* v. *Spiegel*, 31 Mich. 400; *Crawford* v. *Hoeft*, 58 Mich. 1 (23 N. W. 27, 24 N. W. 645, 25 N. W. 567, 26 N. W. 870) ; *Finegan* v. *Theisen*, 92 Mich. 173 (52 N. W. 619) ; *Smith* v. *Cuddy*, 96 Mich. 562 (56 N. W. 89) ; *Lockwood* v. *Lockwood*, 124 Mich. 627 (83 N. W. 613) ; *Sands* v. *Sands*, 112 Ill. 225; *Norton* v. *Norton*, 74 Iowa, 161 (37 N. W. 129).

We now come to the question of ratification. The agreement of October 25, 1905, was made while the guardianship proceedings were pending and which re-

sulted in an adjudication that Mrs. Longenecker was mentally incompetent. What followed after the guardian was discharged does not amount to a ratification which should bind the parties.

The decree is affirmed.

STEERE, C. J., and McALVAY, BROOKE, STONE, and OSTRANDER, JJ., concurred.