## GREGORY NOLAN v. EDWARD E. NOLAN EL AL.

*Equity—Bill filed to set aside deed, etc.—Fraudulent conveyances.*

1. A father, at the urgent request of his wife and son, conveyed his homestead to his son, who executed to his father and mother a life lease of the property. The expressed consideration in the deed was $500, and the estimated value of the property was from $3,000 to $5,000. The lease was kept by the mother, and practically out of the father's control. Afterwards, the father was induced to consent to the conveyance by the son to his mother of the south half of the premises; on the understanding that she was to deed to him half of a lot she owned, which she failed to do, and afterwards conveyed it to her son, and conveyed the south half of the other lot to a daughter, who gave her back a life lease in her individual right. Domestic troubles increased after this, if they did not substantially begin, and the father commenced litigation to recover his property, which led to a so-called settlement by which he released all of his interest in the north half of the lot to his son, receiving $400 in cash and an agreement from the son to support him comfortably in his home during his natural life, or, at the father's option, to secure for him a home at a hospital in the city for life. This agreement provided for

78 MICH.—2.

$1,000 stipulated damages, if not performed, but was unsecured. At this time complainant executed quitclaim deeds to his son and daughter of all of his interest in the premises originally deeded to his son.   He was refused admission at the hospital, and filed a bill to secure a reconveyance of the property, and for an accounting for rents and profits; and he is held entitled to a reconveyance, from the son and daughter and mother, of the north half of the lot originally deeded to the son, or, if they prefer, to the sum of $1,500, adequately secured, and payable in installments.

2. The following propositions are summarized from the opinion of Mr. Justice CAMPBELL:

*a*—In cases involving family transactions, where the testimony of the parties is conflicting, circumstances are important factors in getting at the truth.

*b*—In case of a joint lease to husband and wife, which does not come within the rules applicable to tenants in common, the husband's common-law rights as head of the household are important.

*c*—A wife cannot stipulate for giving any one a home in her husband's household.

*d*—An unsecured agreement from a son for the life support of his father, in exchange for property of which the father denudes himself, is unconscionable, unless very evidently safe.

Appeal from Wayne.   (Reilly, J.)   Argued October 10, 1889.   Decided November 15, 1889.

Bill for a reconveyance of property, and for an accounting for rents and profits.   Complainant appeals.   Decree reversed, and one entered in accordance with opinion, in which the facts are stated.

*James H. Pound,* for complainant.

*James C. Smith, Jr. (John H. Bissell,* of counsel), for defendants.

CAMPBELL, J.   Complainant brought his bill against Mary A. Nolan, his wife, and his son, Edward E. Nolan, and his daughter, Annie A. McPherson, to obtain redress

for a series of transactions whereby he claims he was defrauded and cajoled out of his property.

As he sets up and shows, he was, in 1880, owner of lot 1, on the Chene farm, on the corner of Chene and Larned streets, in Detroit, of considerable value, varying in estimates from $3,000 to $5,000, as also of some other property. By various arrangements with members of his family, he has been deprived of all his property. He claims that this result was brought about by fraudulent means, and seeks relief to restore him to his rights in whole or in part, as practicable. Lot 1 has by these transactions become vested, one-half in fee and the other half for life, in his wife, Mary Ann Nolan; the reversion of the southerly half being in Annie A. McPherson, as the abstract of title in the case indicates, as made up when the bill was filed. The court below dismissed the bill, and he appeals.

The case is one of peculiar hardship, and complainant's equities are very strong. It is not pleasant to deal with family dissensions, and it is not desirable to spread upon our records any more than is necessary to dispose of the controversy. As far as necessity requires it, the reference will be made.

In June, 1880, complainant and his wife had lived together a good many years, and had two children in early manhood and womanhood, who had been afforded means of education of an excellent character, at considerable expense, and who about that time were married. The wife owned a lot on Orleans street, worth $4,000 or $5,000, improved in part by complainant's means, from which some revenue was derived, and the husband owned the lot on Chene street, and other property near by. He had been industrious and saving, and some help had been given by the wife in earning money for joint account, but we think not to any large extent. Up to that time

there seems to have been no special, if any, discord. At this time complainant was urged by his wife and son to convey the principal lot on Chene street to the son. It is unfortunate that upon most of the family transactions the parties testify against each other's statements to a great extent, and we must settle the facts as well as we can. But circumstances here, as in most such cases, are important factors in getting at the truth, and they seem to us very convincing. It is plain to our conviction that the wife had become desirous of getting everything under her own control, and while she seems to have had an attachment to her children, she evidently had no wifely attachment to her husband, and no regard for his interests. The children appear by the record in a rather more favorable light, and, while their conduct is not free from censure, it appears to have been much under the prompting or influence of their mother.

The land was conveyed to Edward Nolan, and he gave back a life-lease to his father and mother jointly. The deed contained an expressed consideration of $500. How far this was nominal and how far real is not easy to determine, and is perhaps not now necessary to decide. The father was evidently attached to the son, and soon after spent some $500 or more in building another house on the property conveyed. As this lease was a joint one to husband and wife, and did not come within the rules applicable to tenants in common, the husband's common-law rights as head of the household were important. This lease was not recorded, being unacknowledged. It was subsequently certified as acknowledged by the justice who witnessed it. Thereafter it was, as we think very clearly shown, kept in Mrs. Nolan's custody, and ultimately, if not always, practically kept out of complainant's control.

In March, 1881, complainant testifies he was induced

to consent to the conveyance by Edward to his mother of the south half of lot 1, on the understanding that she would give complainant half of her Guoin-street property. After the conveyance to her she did not convey the land as she agreed, and ultimately she conveyed it to her son. An attempt was made to show that she was willing to deed to complainant, but we do not give credit to the testimony, as there could have been no reason for not carrying out her purpose, if intended. The testimony on this subject of the Guoin-street lot is neither credible nor consistent. In July, 1881, Mrs. Nolan conveyed the south half of lot 1 to Annie McPherson, who gave back a life-lease to her individually. Both of these papers were left unrecorded till after the compromise hereafter referred to, in March, 1883. But from this period domestic troubles increased, if they did not substantially begin, and complainant was practically crowded out, if he was not driven out, from his home comforts. He was entirely beggared, so far as any control of property was concerned.

It is claimed that his temper was cantankerous and provoking, and that he made his misfortunes himself. It is probable that he became exasperated, and it is not strange that he showed unpleasant dispositions. But the record does not show, except by some testimony which is not harmonious with circumstances, that so long as he kept control of his own property there was any such extreme ugliness or anything unusual. That he labored and saved for his family is shown clearly, and there is nowhere any evidence that he was selfishly disposed against them. But, if their conduct was such as he claims, it would have required a degree of humility and patience beyond any legal requirements to submit to it with equanimity.

As soon as he was apparently cut off from his legal

rights, there was evidently no disposition anywhere to compensate him. He commenced more or less litigation to obtain redress, by suits against his wife and his son. How or why these attempts were not carried further the record does not clearly show, except that the suit against his wife led to the settlement. But it does show that his wife, and to some extent his children, did not quit scheming, and from the result of the alleged compromise, in 1883, it is manifest that they had been anxious to get rid of his equities, and were not anxious to do so fairly, and were probably no more candid to counsel than to others.

On that occasion he ostensibly settled, on the terms that he should receive from Edward $400 cash, and provision for his comfortable sustenance for life, and he released all his estate for life or for years in Edward's north half of the premises,—a release that was evidently deemed important in spite of the assertions of the witnesses that it had long before been given up. There was no written evidence of his wife's agreement to give him part of her Guoin-street property in exchange for the south half already deeded to her. This alleged settlement was on March 15, 1883, and it requires notice. The wife was not brought into it, except as getting some advantages.

On that day, in pursuance of the negotiations then held, a written agreement was sketched out, whereby Edward and Mrs. McPherson were to pay complainant $400, and keep him, at his choice of either of their homes, and give him a comfortable home and support for life, or, at his option, to secure him a home at St. Mary's Hospital for life in the same way. This paper, drawn up in pencil, was objected to because he did not wish to have Mrs. McPherson in it. Her name was struck out, without any other change, and it was finally

understood that a new copy, in substance, should be prepared for execution shortly, and this was signed in the mean time. Complainant executed at this time three quitclaim deeds, which covered everything in which he was supposed to set up or to be likely to set up any claim. The $400 was paid. One of these deeds was a quitclaim to Annie McPherson of the south half of lot 1, and one a similar deed to Edward of the north half. These deeds were put on record the same day, and at the same time the older deeds between Mrs. Nolan and her daughter were recorded, and Mrs. McPherson put a mortgage on her land. Six days thereafter Edward conveyed the north half of his lot to his mother in fee. It does not appear just how soon afterwards the perfect copy of the agreement of compromise was prepared and signed by Edward. Complainant refused to sign it, and the reason testified to is stated, with some vagueness, as arising from some deeds of which he was ignorant. He was left by this agreement—allowing it to be what he actually agreed upon—with the alternative of a choice between Edward's house and St. Mary's Hospital, with a sum of $1,000 stipulated damages for failure of Edward's unsecured agreement. St. Mary's Hospital declined to receive him.

It is claimed for the defense that in all his dealings he was fully advised and had his interests looked after. If, however, he was ever so honestly advised into a transaction fraudulent in law and fact, as he claims this to have been, that may absolve his advisers, but it will not necessarily relieve the parties who got the advantage of him, and who very possibly, if not probably, managed to mislead everybody.

Certain facts stand out very unpleasantly in this arrangement. Why he objected to Mrs. McPherson's name in the papers does not fully appear, but he might very well have been advised that her signature would

be a nullity, as she could not stipulate for giving any one a home in her husband's household, and the contract would not be a charge, as drawn, on any property she possessed. But why Mrs. Nolan was not made a party, either to furnish a home or to secure in some way the obligation for which she meant to get the benefit, is not so manifest. And why no security was required of Edward is not explained. An unsecured agreement of this kind, in exchange for property of which a father denudes himself, is unconscionable, unless very evidently safe, as it certainly was not here.

But the contract was otherwise illusory. It appears to us, although there is some dispute, that on that occasion it was known that the old man could not live at Edward's, and that the refuge at St. Mary's was what he would choose. Edward's wife was not disposed to treat him pleasantly. Under these circumstances, the suggestion that he then knew he would not be received at St. Mary's is incredible. It also appears it was undoubtedly in some way impressed on him that he could go there, and stay there if he obeyed the rules. The steps almost immediately taken to get the property transferred from Edward to Mrs. Nolan were strong indications of the fraudulent purpose of the mother, and of the fraud or weakness of Edward, and the haste to record the deeds is significant. The result of this settlement was that complainant became stripped of all his property, and his wife got control of it for herself and her daughter, and he got nothing but $400, which was much less than the value of its previous use, with an impracticable contract, vague in character, and purely personal, which secured him no home or support, and gave him only an unsecured claim for damages, which was contested as soon as set up.

No amount of plausibility can exonerate Mrs. Nolan and Edward from the guilt of scheming to absorb the complain-

ant's property, and cheating him out of any consideration for it. The steady and consistently selfish management of Mrs. Nolan shows her hand in it from the beginning. She has the usufruct of all the property, and the fee to the best part of it, and is therefore in a position to be compelled to do such approximation to justice as is practicable. No injustice to her would be done by opening the whole series of dealings, especially as the settlement was intended to prevent him from pursuing his claims for redress, and except as to the $400 was practically a fraud itself. It was immediately aimed at avoiding the specific performance of the agreement to convey to him the Guoin-street property, and Mrs Nolan was in this the chief agent or party interested, although the occasion was used to get other releases. But as a result of these transactions the titles have all become beyond easy reach, except what Mrs. Nolan herself retains.

It would do no injustice to put back the whole title in complainant. But we are inclined to confine relief to a moderate provision. Complainant will be entitled to a reconveyance of the north half of lot 1, on the Chene farm, being the property he conveyed to Edward in the first instance, which, for reasons appearing in the record, we shall require to be joined in by all the defendants, and the decree in the meantime to stand in lieu of a conveyance. But in case defendants shall prefer to secure him by adequate security, to be approved by Judge Reilly, in the sum of $1,500, and to be executed within 30 days, with or without personal liability, such security may stand in place of the said reconveyance. It shall provide for the payment of $500 within a year from the date of this decree, and the balance in four equal yearly installments, without interest until after each shall become due. Complainant to recover costs of both courts.

The other Justices concurred.