POWER *v.* PALMER.

1. DEEDS—WILLS—INTENT OF GRANTOR.
   Where a father had willed ·his property in equal shares to his daughter and two sons, and about six months before his death deeded most of his property to the two sons, evidence *held*, to show that he did not thereby intend to divest himself of substantially all his property, nor to interfere with his testamentary disposition of the same.

2. EVIDENCE—PAROL AGREEMENT—DEEDS—INTENT OF GRANTOR.
   In a suit to set aside deeds by plaintiff's father of all of his property to her two brothers, as in fraud of her rights under her father's will, evidence of a parol agreement between the parties ·that plaintiff should have her share· of the property, made after the father's death, was admissible to show the purpose of making the deeds, and whether they were intended to so operate as to deprive plaintiff of her .rights under the will; plaintiff claiming no· rights under said parol agreement.

3. DEEDS—EVIDENCE—INTENT OF GRANTOR—INFERENCE.
   Testimony that one of the sons came to the home of his daughter, where the deeds were signed, just after the signing, and that he then knew the nature of the deeds, *held*, with other testimony, to warrant the inference that he had talked with his father about the deeds, and knew the latter's purpose in making them.

4. SAME—INTENT OF GRANTOR—ADMISSIONS AGAINST INTEREST CONVINCING.
   The willingness of said son, immediately after the father's death, to arrange matters so that plaintiff would have her share of the father's estate, *held*, to tend strongly to establish the fact, as claimed by plaintiff, that the deeds were not intended to so operate as to deprive her of her rights under the father's will; admissions against interest being always considered convincing proof.

5. SAME—WITNESSES—EVIDENCE—WEIGHT OF EVIDENCE.
   Where said son's testimony lacked fairness and frankness,

was inconsistent with his conduct, and was contradicted by many witnesses, but little consideration should be given to it.

6. SAME—DELIVERY—RECORDING.
    Where grantor delivered deeds to his attorney and asked to have them recorded and returned, there was no delivery by grantor or by his direction so as to pass title, since a deed takes effect from the time of its delivery and not from the time of its date, execution, or record.

7. SAME—PRESUMPTION OF DELIVERY FROM RECORDING REBUTTED.
    The presumption of delivery arising from the recording, *held*, to be rebutted by the evidence, and by the fact that grantor exercised full control over the property during his lifetime.

8. SAME—CONSIDERATION—UNCONSCIONABLE.
    A deed made without consideration, by which an aged man divests himself of substantially all of his property, without any provision for his future support and maintenance, is unconscionable.

Appeal from Lenawee; Hart (Burton L.), J. Submitted April 6, 1921. (Docket No. 9.) Decided June 6, 1921.

Bill by Idella M. Power against Elwood C. Palmer and another to set aside certain deeds. From a decree dismissing the bill, plaintiff appeals. Reversed, and decree entered for plaintiff.

*B. D. Chandler*, for plaintiff.

*Baldwin & Alexander*, for defendant Elwood C. Palmer.

SHARPE, J. John C. Palmer died at Royal Oak on January 30, 1919, aged 94 years, leaving a last will and testament, executed on March 25, 1917, by the provisions of which all of his property was devised and bequeathed to the plaintiff, a daughter, and the defendants, his two sons, in equal shares. On July

19, 1918, about 6 months before his decease, he executed two deeds, one conveying a farm of 120 acres in Hillsdale county, and the other a house and lot in Hudson, Lenawee county, both of the value of about $10,000, to the defendants as tenants in common. This suit is brought by the plaintiff to set aside these deeds. The bill alleges that the grantor was mentally incompetent and unduly influenced by the defendant Elwood C. Palmer at the time the deeds were executed, and further that they were executed without consideration and are a fraud upon the rights of the plaintiff as a daughter and legatee under the will of John C. Palmer. It is alleged that the defendant Langford W. Palmer had no knowledge of his father's intention to so convey his property, and is now ready and willing to release any rights acquired by him thereunder. It is also alleged that the defendant Elwood C. Palmer, after his father's death, agreed to execute a writing which would secure to plaintiff her share of the estate as devised to her in her father's will. The proofs were taken before the trial court, who found against the plaintiff. From a decree dismissing her bill of complaint, the plaintiff appeals.

The testimony shows that the deeds were made without consideration, and that by them the grantor denuded himself of substantially all of his property, without any reservation of any interest in himself or any provision, oral or written, for his future support and maintenance. By them he excluded his daughter, the plaintiff, from any participation in his estate except as to a small amount of personalty of which he died possessed. Such action on the part of a man 94 years of age is, of itself, so unusual as to compel a more than ordinarily careful scrutiny of the record before us. We have read it with much care.

At the time of his death, John C. Palmer was living in the home of his granddaughter, Eva Kennedy, a

daughter of his son Elwood, at Royal Oak. Previous thereto, he had lived for several years in the home of the plaintiff at Hudson. He then lived for a time with the tenant on his farm. In March, 1918, he was taken by Elwood to the home of Mrs. Kennedy. While at plaintiff's home, he had indorsed a note for her husband for $2,000, which was unpaid at the time the deeds were made.

The home of the defendant Langford is at Hagerstown, Maryland. A few days after the deeds were made, he visited his father at Royal Oak. He was informed by Elwood's wife about the deeds and talked with his father, and afterwards with Elwood, about them. He testified that Elwood said—

"The deeds were drawn to avoid the inheritance tax and the probating in two counties, and to protect us against these notes. After these notes were paid, Mrs. Power was to have her share." ·

The deeds were prepared by Mr. Hoxie, an attorney at Royal Oak. Mrs. Kennedy testified:

"About a week or some such matter before the deeds were drawn, he began to talk to me about having the deeds made. It is hard to state exactly what he said. He said, 'I want to fix my property, and I think I will deed the farm,' and he spoke of my getting some one to come and see him about the deeds. I went and saw Mr. Hoxie and told him grandfather would like to have him come down to the house. * * * I heard him tell Mr. Hoxie the deeds were to be made to Elwood and Langford. There was absolutely nothing said about the deeds being made for the purpose of evading probating or avoiding paying inheritance tax. I never heard grandfather say anything about the deeds being made for that purpose, or anything like it. His exact words were that he didn't care if Mrs. Power had a dollar, he would never give her anything."

On cross-examination, she said:

"He talked about his having signed some papers

at the bank with him (Mr. Power). I think he said $2,000, a note he claimed he had indorsed there or signed. He was very much worried about it. My father was there at my house often. My father read to my grandfather more than he talked, but they talked some, of course. I don't remember hearing my father and grandfather discussing the note or paper that he had indorsed at the bank with Mr. Power, but I know grandfather talked with Langford about it when he was there. He was worried about it. He was afraid his estate would have to pay that note that he had indorsed there at the bank.

"Q. And he talked to Langford about that, that he had made those deeds for that purpose, didn't he?

"A. I think so.

"Q. You heard your grandfather tell that to Mr. Palmer?

"A. I didn't always hear the conversations with Uncle Langford.

"Q. But you did hear that part of it in which he talked with Langford about this paper he had indorsed at the bank which was worrying him, and he had made those papers to protect his estate. Isn't that what he told your Uncle Langford?

"A. I think it was. * * *

"My father was there the night the deeds were executed. He came in to supper. He knew what the contents of the deeds were there that night.

"Q. Did he appear at all surprised that your grandfather had made the deeds that day?

"A. No, I don't remember that he was surprised.

"Q. In fact, he knew that was what was going to be done, didn't he?

"A. Probably he did, I don't know that he did. I don't remember of talking with my father about my grandfather wanting to get a lawyer to draw the papers. During all the time after my grandfather came, my father was a frequent visitor at my house."

Bennett Houston, the tenant on the farm, testified that he saw a notice in the paper of the transfer of the farm and soon after had a talk with Elwood about it.

"I told him I understood there was to be a change in the property and wanted to know who the new boss was to be. He said there wouldn't be any new boss, that it would be just the same as it had been, that his father had the running of it as long as he lived just the same; that the transfer was made to save probating. He said the transfer had been made to save probating."

The Sunday following the funeral of John C. Palmer, Elwood and Langford and Mr. and Mrs. Power were at G. Harvey Smith's home for dinner. Mr. Smith was an old friend of the family. He and his wife and Langford all testified that, after Mr. and Mrs. Power left, Langford said that they were going to divide the property equally among the three heirs and Elwood assented to it; that Langford was going to Adrian the next day to get a copy of the will which had been deposited with the judge of probate, and Elwood was going to the farm, and that they would then get together and divide up. The plaintiff and her husband both testified that Elwood stated after the funeral that the deeds were made to avoid the inheritance tax and the expense of probating in the two counties.

It further appears, without dispute on the part of Elwood, that an agreement was to be drawn up by Judge Chandler providing for an equal division of the property as provided for in the will. Such an agreement was prepared and signed by Langford and plaintiff. Elwood admits that he agreed to sign it but changed his mind. His claim is that he was advised by his lawyer that the writing amounted to a quitclaim deed to plaintiff of a one-third interest in the property and that he only agreed she should have her interest after the property was sold.

It seems clear to us from the proofs submitted that John C. Palmer had no intention, when he executed these deeds, to divest himself of substantially all the

property he owned and thus render himself subject to the bounty of his two sons. The only statements made by him, so far as the proofs show, as a reason for this unusual act on his part, were that he said to Langford, in the presence of Mrs. Kennedy, that he was worried about the note he had indorsed for plaintiff's husband and he made the deeds to protect his estate therefrom, and that he said to Mr. Hoxie, the attorney who drew the deeds, in answer to a question as to why he was doing it, "I have had more enjoyment since I have been here than I have had since my wife died." In addition to these statements of the deceased, we have the statements of Elwood to Langford and to the tenant Houston which tend strongly to show that the grantor did not intend by the deeds to interfere with the disposition of his property as made in his will. After the death of his father, we find Elwood content that the plaintiff should have her undivided one-third of the property and yielding assent to the preparation of a contract which should so provide. While what was then said and done are in no way legally binding upon him, it is quite convincing that he knew his father had no intention of depriving plaintiff of the interest in his estate provided for her in the will.

While Elwood admits that there was talk at plaintiff's home and also at the home of Mr. Smith that papers should be prepared which would secure to plaintiff her equal share of the estate, he denies that he took part in such conversation. There is an abundance of evidence to show that he agreed to such an arrangement. He admits writing a letter to Langford, after he had refused to sign the writing prepared by Mr. Chandler, in which he said,

"My understanding of that contract was that Dell was to have her share of the property when it was sold and the estate settled."

He was then asked:

"*Q.* And that was the agreement as you understood it? As you say here, that was the agreement that you and your brother and your sister made there in her home following your father's funeral, wasn't it?

"*A.* Yes, sir. I want to tell you now, a man can change his mind."

While plaintiff does not seek to enforce any rights under the parol agreement, we think what was said and done relative to it was admissible and may be considered in determining the purpose for which the deeds were made. While Elwood denies that he knew anything about the making of the deeds until after their execution, Mrs. Kennedy testified that he came to her home just after they were signed and that he then knew the nature of the deeds which had been made. A reasonable inference may be drawn from this and other testimony that he had talked with his father about the deeds and knew the latter's purpose in making them. His willingness immediately after his father's burial to arrange matters so that his sister would have her share of the estate tends strongly to establish the fact, as claimed by plaintiff, that the deeds were not intended to so operate as to deprive plaintiff of her rights under the will. Admissions against interest are always considered convincing proof. 16 Cyc. p. 943 *et seq.*

Elwood also denies much, if not all, that is testified to relative to statements made by him as to the purpose for which the deeds were made. But his testimony lacks that fairness and frankness necessary to give it weight when contradicted by so many witnesses. While admitting that his brother talked to him and told him that he had conversed with his father about the deeds, he denies there was any talk about why the deeds were made. Yet in answer to the next question put to him, he says that

Langford told him he didn't think their father ought to have made the deeds to them. There are many other parts of his testimony so utterly inconsistent with his conduct that we feel but little consideration should be given to it.

We have not overlooked the testimony tending to show that Mr. Palmer claimed to have been ill-treated and neglected while at the home of plaintiff, or that of Mr. Halstead, an old friend, who testified that Mr. Palmer told him he had made the deeds and disposed of his property as he wanted it to go. He would not have been likely to have expressed to Mr. Halstead the reason he gave Langford for making the deeds. He was familiar with the effect of wills and conveyances, and had acted as administrator of estates. Had he not been content with the provisions in his will, he could easily have changed it, at less expense and trouble than was involved in making the deeds. The means employed are persuasive that his purpose was not to convey his property to his sons to the exclusion of his daughter, but to prevent his estate from being chargeable with the payment of the note he had indorsed for Mr. Power and also to save the inheritance taxes and the expense of probating his will.

It appears clearly from the proofs that the deeds were not delivered to Elwood by his father or by his direction. Mr. Hoxie testified that after the deeds were executed Mr. Palmer delivered them to him "and asked me to have them recorded and returned." He was not asked what he did with them after having them recorded, but Elwood testified that the deeds were delivered by Mr. Hoxie to him. A deed takes effect from the time of its delivery and not from the time of its date, execution or record. While the recording is presumptive evidence of delivery, such presumption may be rebutted. See cases cited in *Lawton* v. *Campau, ante,* 535. In that case it was said:

"The object of delivery is to indicate an intent on the part of the grantor to give effect to the instrument."

We think the presumption arising from the recording is well rebutted by the facts here established, and that there was no intent on the part of the grantor to convey a present or even future estate to the grantees. This conclusion is supported by the further fact that Mr. Palmer exercised full control over the property during his lifetime.

Under the facts appearing in this record, established as we think by convincing proof, it would work a rank injustice to permit these deeds to stand as conveying title to the defendants. A deed made without consideration, by which an aged man divests himself of substantially all of his property, without any provision for his future support and maintenance, is unconscionable. *Nolan* v. *Nolan,* 78 Mich. 17. As was said in *Akers* v. *Mead,* 188 Mich. 277:

"Previous decisions are of little assistance in determining these questions, and each case must be determined upon its own facts."

The language used in the following cases will, however, be found illuminating on the question presented: *Seeley* v. *Price,* 14 Mich. 541; *Van Donge* v. *Van Donge,* 23 Mich. 321; *Duncombe* v. *Richards,* 46 Mich. 166; *Smith* v. *Cuddy,* 96 Mich. 562; *Lockwood* v. *Lockwood,* 124 Mich. 627; *Longenecker* v. *Graham,* 176 Mich. 84.

We have examined with care the many cases cited and quoted from by defendant's counsel in their carefully prepared and exhaustive brief on the question of undue influence, but do not think them controlling on the facts here presented.

We have no doubt that, had Mr. Palmer in his lifetime asked to have these deeds canceled, he would have been granted such relief. In view of the facts

as they appear in this record, we think the plaintiff is entitled to the relief she prays for in her bill of complaint. A decree may be entered here declaring these deeds to be null and void. Plaintiff will recover costs of both courts against the defendant Elwood C. Palmer.

STEERE, C. J., and MOORE, WIEST, STONE, CLARK, and BIRD, JJ., concurred. FELLOWS, J., did not sit.