LEIDEL v. BALLBACH.

1. DEEDS—INTENT TO SIGN A DEED—TRICK—FORGERY—EVIDENCE.
   Plaintiff who willingly and knowingly signed quitclaim deed to her son may not be relieved of her misplaced confidence in him by obtaining a reconveyance from innocent purchasers for value from him, where the rule that a signature to such an instrument that is procured by some trick or device, without intent on the part of the party signing to execute such an instrument, would be deemed a forgery in law, is not applicable under evidence presented.

2. ACCOUNTING—EVIDENCE.
   Defendant son was properly decreed to account to his mother for moneys he had obtained by mortgaging her home . and later selling it, where evidence showed he had not accounted to her.

3. VENDOR AND PURCHASER—INNOCENT PURCHASER FOR VALUE—EVIDENCE.
   Finding of trial court that defendant grantees of plaintiff's son were innocent purchasers for value and that sum which they had paid was a fair value *held*, supported by testimony in mother's suit to set aside deeds and for an accounting.

4. SAME—OCCUPANCY AS NOTICE.
   Plaintiff's occupancy of her home *held*, not to have constituted notice to defendant purchasers from her son that she claimed an interest in the premises, under evidence presented.

5. SAME—QUITCLAIM DEED—NOTICE OF INTEREST.
   Record sustained trial court's finding that plaintiff was not entitled to relief from defendant purchasers of premises and their mortgagees, where plaintiff's son had been given a quitclaim deed and failed to properly account for moneys received but other defendants were without notice of her claim of an interest in the premises.

REFERENCES FOR POINTS IN HEADNOTES
[1] 16 Am Jur, Deeds §§ 26, 27.
[4] 55 Am Jur, Vendor and Purchaser § 719.
[5] 55 Am Jur, Vendor and Purchaser § 674 *et seq.*

Appeal from Wayne; Brennan (Vincent M.), J. Submitted January 4, 1956. (Docket No. 14, Calendar No. 46,342.) Decided April 2, 1956. Rehearing denied May 14, 1956.

Bill by Elizabeth Leidel, with proceedings carried on by Dale E. DeVogelaer, next friend, against Ray L. Ballbach, Kathleen L. Ballbach, Alfred C. Ballbach and Ida Ballbach, and against Leonard L. Leidel, Leona Leidel and Bank of Commerce of Centerline to set aside deed claimed to be a constructive forgery and to reach proceeds on sale of property. Original decree confirmed title to property in defendants Ballbach and granted plaintiff relief only as to defendants Leidel, impressing trust on funds received by them. On rehearing this decree set aside and decree entered granting plaintiff relief as to title of real property. Defendants Ballbach appeal. Reversed and original decree ordered in effect.

*Douglas Leo Paterson,* for plaintiff.

*G. Norman Gilmore* and *Irvin F. Ballbach,* for defendants Ballbach.

Kelly, J. On January 5, 1952, defendants and appellants Ray L. Ballbach and Kathleen Ballbach purchased, for $9,000, a 2-story home located on Troester avenue, Detroit (hereinafter referred to as the property). Defendants and appellants Alfred C. Ballbach and Ida Ballbach, father and mother of Ray L. Ballbach, advanced $6,000 of the purchase price and secured said amount with a mortgage on the property.

On February 29, 1952, plaintiff and appellee, Elizabeth Leidel, filed her bill of complaint, challenging the Ballbachs' purchase and alleging their grantor, defendant Leonard L. Leidel, was her son and that he obtained title to the property by duress and fraud.

The circuit court of Wayne county, on October 4, 1952, decided that appellants were innocent purchasers for value, with neither actual nor constructive notice of any claims or rights on the part of the plaintiff; that a decree would be entered accordingly, and title to the described premises confirmed in them. In the same opinion the court held that the defendant son should account to plaintiff for all moneys obtained from his sale of the property to the Ballbachs.

The court denied a motion for rehearing on November 28, 1952, but set aside said denial on December 18, 1952, and granted a rehearing. On September 17, 1953, the opinion of the court on rehearing was filed. In this opinion the court stated:

"After consideration of the issues presented, and referred to below, the court has reached the conclusion that its opinion, under date of October 4, 1952, deciding the issues involved, should be amended so as to give the plaintiff the relief sought against the defendants Ballbach.

"Plaintiff, upon the rehearing, relies, principally upon the case of *Horvath* v. *National Mortgage Co.,* 238 Mich 354 (56 ALR 578), and companion cases. * * *

"The court, in its original opinion, did not pass upon the question of whether the quitclaim deed * * * from Elizabeth Leidel to Leonard Leidel and wife, constituted a forgery. Counsel for plaintiff, in his original brief, cited the *Horvath* and companion cases; but, so many other questions of fact and law were presented for consideration that the court apparently, inadvertently, overlooked the significance and the application of the rule of law as laid down in the *Horvath Case.* Frankly, the court entertained the view that a forgery exists only if the signature is simulated or 'faked'; but now, after considering, carefully, the holding in the *Horvath* and the other Michigan cases, cited above, the court holds that the quitclaim deed * * * constituted a for-

gery and that, therefore, the Ballbachs, even as innocent purchasers, obtained no title to the property from Leonard and Leona Leidel, and the decree will provide for a reconveyance by the Ballbachs to the plaintiff. * * *

"The court still holds that the Ballbachs were completely innocent purchasers; but holds now, that they could not acquire valid title from one who acquired his apparent title through trickery and fraud."

The record discloses that the only reason the holding of October 4, 1952, was changed to that in the opinion of September 17, 1953, was because of the trial court's construction of the legal principles set forth in *Horvath* v. *National Mortgage Co.*, 238 Mich 354 (56 ALR 578).

We are of the opinion that the trial court properly found on October 4, 1952, that defendants Ballbach were entitled to title to the property and that the trial court improperly construed and applied the legal principles set forth in the *Horvath Case.*

In the *Horvath Case, supra,* the plaintiff was a Hungarian by birth, had but little knowledge of the English language, and was entirely ignorant of business matters. A man by the name of Vasvary gained plaintiff's confidence and convinced her that he could manage her property in such a way as to increase the revenue and plaintiff signed a power of attorney appointing him to manage the property. On the same date Vasvary seems to have procured a warranty deed of the premises from plaintiff. Plaintiff denied that she signed the deed and stated that if her signature thereto was genuine it was procured by trickery. After reviewing the record in the case, this Court held (p 358):

"It is not necessary to recite the methods he used in dealing with her. It is conclusive that he tricked her into signing this deed."

In that opinion the Court commented upon *McGinn* v. *Tobey,* 62 Mich 252 (4 Am St Rep 848), as being the case most applicable, and stated (p 359):

"In that case McGinn was tricked into signing a deed by one Navin. McGinn thought that he was signing a lease."

The Court, in deciding the *Horvath Case,* further said (pp 359, 360):

"In the instant case the plaintiff never meant to execute a deed to Vasvary. She was not asked to do so. There was no talk between them concerning a deed. No one testifies that she signed it. Her signature was proven on the hearing by the testimony of handwriting experts. If she signed the deed it was at the same time that she signed the letter appointing Vasvary her agent. Through some clever manipulation of the papers by Vasvary, she evidently signed the deed. He is the only person who knows how it was done, and he declines to testify. We can see no reason for any distinction between the act of simulating a signature and procuring the signature as Vasvary did in this case. The effect is the same. The deed was in law a forgery. And those who subsequently innocently acquired interests under the forged instrument are in no better position as to title than if they had purchased with notice. *Crawford* v. *Hoeft,* 58 Mich 1.

" 'There can be no such thing as a bona fide holder under a forgery, whose good faith gives him any rights against the party whose name has been forged or his heirs.' *Austin* v. *Dean,* 40 Mich 386."

The record in the instant case establishes the fact that plaintiff willingly and knowingly signed the quitclaim deed to her son. There was no denial by plaintiff that she signed the deed. The fraud practiced which would constitute a forgery, as proclaimed in the *Horvath Case, supra,* does not apply to this case, and to establish this point there is set forth in

this opinion quotations from 4 Supreme Court decisions where the *Horvath* principles were invoked and discussed.

In *Kuczewski* v. *DeMagnussun,* 242 Mich 296 (57 ALR 756), our Court stated (pp 298–300):

"Counsel are not in disagreement as to the law. The question is whether it is applicable to the facts as shown by the record. The plaintiffs went to the office of DeMagnussun to sell their land contract. They knew that they were going to dispose of their entire interest in the property and they were willing to sign all of the necessary papers. The husband * * * had conducted the preliminary negotiations with DeMagnussun and understood that they were not to be paid in full until a week after the papers were signed. His wife was not informed of this arrangement and expected that when the deal was closed they would be paid in cash. * * *

"Both of the plaintiffs say that they did not know that they were signing a deed. It clearly appears, however, that they knew they were signing whatever papers were necessary to convey their entire interest in the property. * * *

"When the plaintiffs signed the papers, they knew that they had conveyed their entire interest in the property to DeMagnussun. * * * She (the wife) was not tricked into signing the papers. Her only complaint at the time was that they were not to get payment as she had expected. The plaintiffs' testimony does not make a case of constructive forgery. They signed the papers willingly with full knowledge that they were passing their interest in the property to DeMagnussun. * * * Their unfortunate situation is due solely to the fact that DeMagnussun was a swindler and did not fulfil his promise to pay. In view of these facts, the court is powerless to grant them relief against a bona fide purchaser."

In *Sponseller* v. *Kimball,* 246 Mich 255, 260, we said:

"It is the fact, as contended by plaintiffs, that a mortgage given on her separate property by a married woman to secure her husband's debts, if procured by his fraud, may not be valid in the hands of a mortgagee even though the latter was not a party to the fraud (citing cases), and where a person is induced to sign a deed by a trick, not knowing or intending to execute such instrument, it is a forgery and not enforceable, even in the hands of a subsequent purchaser without notice. *Horvath* v. *National Mortgage Co.,* 238 Mich 354 (56 ALR 578).   *   *   * These authorities are not applicable because here the consideration for the mortgage ran to Mrs. Sponseller as well as to her husband and she knew that she was executing a mortgage."

In *Marshall* v. *DeMagnussun,* 253 Mich 56, 58, this Court said:

"We cannot find that plaintiffs' signatures were procured by trick in the sense of an artifice or deceitful contrivance keeping from plaintiffs knowledge that they were signing a deed. Under the evidence, plaintiffs unwittingly dealt with a scoundrel who was too wily to resort to constructive forgery when it was not necessary. Plaintiffs thought they were dealing with an honest man, and they trusted him too far, for his wicked scheme was to induce them to openly place their property in his name so that he might sell the same and pocket the proceeds."

The last case we shall cite, *Grube* v. *Bessenger,* 259 Mich 57, should eliminate all doubt that where a person knowingly signs a deed the *Horvath Case, supra,* cannot be invoked to make such signature a constructive forgery. In the *Grube Case* the wife signed a blank deed at her husband's request. She knew that she was executing a deed to be used in conveyance of real estate. She was deceived, however, by her husband, who told her that he intended to convey a lot owned by him and then later filled in the

description of a lot owned by her. The Court stated (pp 59, 60):

"Counsel for appellee relies upon a number of decisions of this Court to sustain this (the trial court's) holding. They are collected and commented on in *Horvath* v. *National Mortgage Co.,* 238 Mich 354 (56 ALR 578), and may well be said to hold that where a genuine signature to an instrument is procured by some trick or device, without intent on the part of the party signing to execute such an instrument, the signature thereto will be treated in law as a forgery. Such a result is usually accomplished by the manipulation of a number of documents or the substitution of one instrument for another in such a way that a signature to one was procured where the intent was to sign another. There must be an assent of the will of the person signing to execute the instrument to which the name is appended.

"The facts in this case do not justify the application of the holding in these cases to the signature in question. The plaintiff here knew that she was executing a deed to be used in the conveyance of real estate. No trick or device was resorted to, to induce her to sign her name thereto. She understood the nature of the instrument, and delivered it to her husband to be used by him as a conveyance of property. The deception practiced by him was in misleading her as to the description of the real estate he intended to insert therein.

"In *Kurbel* v. *O'Hair,* 256 Mich 680, 684, the following from 1 RCL, p 1022, was quoted with approval:

" 'Where a person executes an instrument containing blanks and entrusts it to a third person with power, express or implied, to fill the blanks in a certain manner, and such third person exceeds his authority in filling them, it is well settled that a bona fide holder will be protected, and the instrument is enforceable in his hands.' "

The property in question herein had been a home for plaintiff and her husband for many years. Plaintiff's husband died in 1949 and they had been on welfare for at least a year previous to his death, due to his illness and inability to work. There was no money to pay for the husband's funeral and a mortgage for $531 was placed on the property. This had not been paid. Her son, the defendant, was plaintiff's only child and he had married and established his own home. Plaintiff had been living for many years alone in this house prior to the institution of this suit. She had a most difficult time in making ends meet, and it was only through the help of friends, relatives, and some welfare money, that this was possible.

In 1951 taxes had not been paid for 2 or 3 years and plaintiff faced the possibility of losing her property through tax sale. In the first or second week of June, 1951, attorney Barney Champski, along with Leonard Leidel and his wife, went to plaintiff's home for the purpose of having a conference with her as to what might be done to save the property.

There is absolutely nothing in this record that would even sustain an intimation that attorney Champski was guilty of perpetrating or conspiring to perpetrate any fraud. In fact, this Court agrees with the trial court's statement: "The court finds as a fact that neither Mr. Champski nor his daughter, Mrs. Mansfield, were guilty of any dereliction of their duties."

Mr. Champski testified that when he entered the Leidel home the son said to his mother: "'Now, mother, you explain to Mr. Champski your difficulties.'"

Plaintiff told him she wanted to keep on living in the house until she died, and then wanted the property to go to her son and his children. She explained to Champski the dire need of doing something to get

money if she was going to hold onto the house. He discussed the matter fully with them and analyzed every possible method to get money, and, finally, it was decided that money would have to be obtained through a mortgage to pay back taxes, make necessary repairs, et cetera. It was agreed that plaintiff's financial condition was such that it would be most difficult, if not impossible, for her to obtain a mortgage in her own name. Plaintiff agreed that the proper solution was to give a deed to her son.

This conference concluded with a discussion about a written agreement between plaintiff and her son, whereby, in return for the deed to her son, he would agree to take care of her during her lifetime and keep the house from deteriorating.

This is a lengthy record of over 700 pages, due, in part, to the fact that not only were the Ballbachs made defendants but also that Leonard and his wife were defendants. It is not the purpose of this opinion to pass judgment upon the issue between plaintiff and her son, as the son, Leonard, and his wife, did not take an appeal from the opinion and decree of the circuit court. The son did place a mortgage on the property and did make certain repairs, such as installation of a furnace, painting the outside of the house, et cetera. The son did not properly account to his mother for the money he obtained, either through the mortgage or through the sale to the Ballbachs, and the court properly asked for an accounting between the son and his mother.

The record in this case sustains the trial court's opinions of both October 4, 1952, and September 17, 1953, that the Ballbachs were innocent purchasers for value and had no notice of plaintiff's claim to any title to or interest in the property. The trial court was correct in stating that the proofs in the case disclosed that the $9,000 paid for the property was a fair value; that defendants were represented by

reputable counsel, and that it would be almost absurd to believe they would pay such an amount for the property if they had had any idea there was any question in regard to plaintiff's rights to said property.

We cannot agree with plaintiff's contention that her occupancy of the premises was notice of her claim of an interest, thereby foreclosing defendants' right to claim they were innocent purchasers for value without notice. The record sustains but one conclusion: That plaintiff knew the property was being offered for sale and did not make any claim of interest to the property. As evidence of this are the following questions and answers in cross-examination of plaintiff:

"*Q.* Mrs. Leidel, when the Ballbachs came to look at the house in the first place, that is, Ray and Kathleen Ballbach and their parents, did you say anything to them about having any interest in the property at all?

"*A.* Well, it seemed I talked a few words to the elderly lady, not very much, because Leona called her out.

"*Q.* What did you say to her?

"*A.* Leona called her. Well, just Mr. Leidel passed away and I was left alone in the home and I still believe I should remain until I die. There wasn't very much said because she was called upstairs, and Leona quite hushed me up. So did Leonard; and I had nothing to say. They were there to look at it."

Both Ray and Kathleen Ballbach and their mothers testified that plaintiff was present when they were shown the house before purchasing; that plaintiff said nothing about her rights in the property, nor did anything that could cause them to believe that she in any way objected to the sale of the property. The only testimony in the record which could in any way sustain plaintiff's contention that her occupancy was of such a nature that Ballbachs

had notice of her claim of interest, was her testimony to the effect that before the deal was closed she had so advised their attorney. Defendants' attorney denied that she had so advised him, and the record is such that we cannot agree with plaintiff that her occupancy was of such a nature as to give notice of her claim of an interest in the premises.

The final point we shall consider in this opinion is the contention of plaintiff that at the time of the execution of the deed she was mentally incompetent to a degree that she did not understand the full import and effect of the papers she was signing.

At the time she testified, plaintiff was 65 years of age. She had been suffering for many years with arthritis, and moved around her home with the assistance of a crutch or cane. The court had a psychiatrist appointed, who made a report that plaintiff was not insane or mentally incompetent, but was easily confused and quite unable to meet the new problems and conditions of life without some kindly help, and the trial court observed that "her power to comprehend legal matters seemed greatly below that of a person of average intelligence." After receiving such report the trial court appointed a next friend. As to plaintiff's mental competency and ability to understand the full import and effect of the papers she signed, we have the testimony of attorney Champski that in his opinion she fully understood and comprehended the transaction in regards the deed to her son. In addition, we have the testimony of Dr. Harold Jarvis, whom plaintiff consulted in July, 1951, shortly after the deed in question was signed. She also consulted him during August and September of the same year. He testified:

"In these visits I did have conversations with her about her personal or business affairs. She told me of a transaction in connection with her home on Troester avenue in Detroit. As I recall, it was that

she had deeded or assigned her home to her son. She stated what the son had given her in return for that deed. The son was supposed to take care of her for the remainder of her life, I believe, and provide for her. In the various conversations that I have had with her her speech was coherent. She evidenced an understanding of everyday occurrences, and things of that kind. I don't believe there was any indication which, in my opinion, indicated a mental abnormality. I don't consider that she has any mental abnormality."

One hundred and twenty-seven pages of the record is devoted to plaintiff's testimony. The conclusion of Dr. Jarvis is confirmed by a careful consideration of this testimony.

We agree with the trial court, as stated in his first opinion:

"The writer has deep, personal sympathy for Elizabeth Leidel in her predicament, but, in view of the Michigan Supreme Court cases which are referred to below, it is my holding that the court has no power to grant relief against innocent purchasers such as the Ballbachs or their mortgagees."

The trial court's action in granting a rehearing and entering the decree of October 2, 1953, is reversed, and the former decree of October 14, 1952, shall stand as the final decree of the court.

DETHMERS, C. J., and SHARPE, SMITH, REID, BOYLES, CARR, and BLACK, JJ., concurred.